**Diego Ricardo ITZCOVITZ, a permanent resident alien residing in New York, New York, Plaintiff-Appellant,**

v.

**SELECTIVE SERVICE LOCAL BOARD NUMBER 6, NEW YORK, NEW YORK, et al., Defendants-Appellees.**

**No. 820, Docket 35664.**

United States Court of Appeals, Second Circuit.

Argued June 8, 1971.

Decided Sept. 1, 1971.

See publication Words and Phrases for other judicial constructions and definitions.

Burt Neuborne, New York City (Paul Chevigny and Alan H. Levine), New York Civil Liberties Union, New York City (David Orlin, New York City, of counsel), for plaintiff-appellant.

Daniel Riesel, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, Alan B. Morrison, Asst. U. S. Atty., of counsel), for defendants-appellees.

Before FRIENDLY, Chief Judge, and HAYS and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Appellant, Diego Ricardo Itzcovitz, a permanent resident alien, seeks a declaratory judgment enabling him to leave the United States for a brief time and a limited purpose, without the threat of being declared an excludable alien upon his return. The purpose of his proposed trip is to attend a special training course in Tel Aviv conducted by his employer, El Al Israel Airlines. He asserts and the Government concedes that, because he exercised his treaty right[1] as an Argentine national to claim exemption from U. S. military service, he would be excludable upon re-entry into the United States, under the provisions of the Immigration and Nationality Act of 1952, 66 Stat. 163 as amended,[2] and his name would therefore be placed in the "Lookout Book," the Immigration and Naturalization Service's list of currently excludable aliens who might be seeking re-entry, apparently distributed to INS agents at points of entry into the United States. Appellant contends that insofar as the provisions of the Immigration and Nationality Act of 1952 do brand him an excludable alien, the provisions place an impermissible burden on his rights under the Argentine Treaty[3] which, incidentally, is similar to fifteen other treaties, principally of Friendship, Commerce and Navigation in granting exemption from military service.[4] Appellant concedes for purposes of this appeal that by exercising his treaty right he has waived his eligibility for citizenship under Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951),[5] but he argues that such a waiver does not mean he may be declared an excludable alien.

Alternatively, appellant claims that as an alien lawfully admitted for permanent residence, temporarily leaving the country at the behest and under the requirements of his employer, he would not be making an "entry" into the United States upon his return from Israel.

The court below did not reach the merits, but found the case unripe, and dismissed the action for lack of a "justiciable controversy," without prejudice to appellant's right later to seek relief from an exclusion order, if and when issued. We disagree with the court below and think that appellant should not be forced into the *cul de sac* of leaving the country, only to be "subjected," on his return, "to the wearisome routine of immigration procedure as though [he] had never lived here," ILWU Local 37 v. Boyd, 347 U.S. 222, 226, 74 S.Ct. 447, 449, 98 L.Ed. 650 (1954) (dissenting opinion), and the probability, in this case, of exclusion. Our view is taken from the perspective of the extensive INS-Itzcovitz history, and has in sight the concession made on argument that appellant

1. The Treaty of Friendship, Commerce and Navigation between the United States and Argentina, July 7, 1853, 10 Stat. 1005, hereinafter the Argentine Treaty.

2. Section 315, 8 U.S.C. § 1426; Section 212(a) (22), 8 U.S.C. § 1182(a) (22).

3. Article X of the Argentine Treaty provides:

The citizens of the United States residing in the Argentine Confederation, and the citizens of the Argentine Confederation residing in the United States, shall be exempted from all compulsory military service whatsoever, whether by sea or by land, and from all forced loans, requisitions or military exactions; and they shall not be compelled, under any pretext whatsoever, to pay any ordinary charges, requisitions, or taxes, greater than those that are paid by native citizens, of the contractive parties respectively.

4. Opinion of the Attorney General, 42 Op. Atty.Gen.No.28 (April 1, 1968), at pp. 1–2. Provisions similar to Article X are found in treaties with China, Costa Rica, Ireland, Italy, Paraguay, Spain, Swiss Confederation, Thailand and Yugoslavia.

5. See Astrup v. INS, 402 U.S. 509, 91 S. Ct. 1583, 29 L.Ed.2d 68 (1971).

would upon departure immediately take his place in the pages of the "Lookout Book." That extensive history follows.

Appellant came to this country from Argentina with his parents in 1966 and was admitted as a permanent ·resident alien. Although he had completed his Argentine military obligation, he was required as a permanent resident alien of draft age to register with our Selective Service System. 50 U.S.C.App. § 453. He did so and was classified I-A on October 24, 1966. On March 29, 1967, he received a notice to report for induction. The Argentine Consulate in New York advised him that he was entitled to exemption from military service pursuant to the Argentine Treaty, and he thereupon applied to our Department of State for exemption. Despite the State Department's best efforts, Itzcovitz was advised by Selective Service, erroneously, as it later turned out, that the draft exemption granted by the Treaty had been impliedly abrogated by the passage of the Selective Service Act. On May 22, 1967, one day before he was required under threat of arrest and prosecution to report for induction, he left the United States and was reclassified IV-C as an alien who had fled to avoid military service. On December 16, 1968, Oestereich v. Selective Service System, 393 U. S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968), held that there may be pre-induction judicial review of the classification of a registrant for the purposes of determining the applicability of unequivocal statutory exemptions. Three weeks later Itzcovitz sued for injunctive relief against the Selective Service System's outstanding induction order and against INS's refusal to permit him to return to the United States.

The late Judge Herlands ruled that he had jurisdiction under *Oestereich, supra,* that Selective Service had no authority to deny Itzcovitz his claimed treaty exemption to which he had a "plain and unequivocal" right, and granted him injunctive relief against Selective Service, but denied injunctive relief against the INS on the ground that Itzcovitz had not exhausted his administrative remedies. Itzcovitz v. Selective Service System, 301 F.Supp. 168 (S.D.N.Y.1969). Itzcovitz appealed from the denial of relief against the Immigration Service, and the Government cross-appealed from the granting of relief against the Selective Service System, but shortly before oral argument in this court the Government withdrew its cross-appeal. During oral argument a panel of this court consisting of (then Chief) Judge Lumbard, Judge Kaufman and Judge Hays suggested that Itzcovitz be permitted to return to this country and resume his permanent resident status. On November 26, 1969, in a letter to that panel, the Government agreed that it was "now prepared to admit Itzcovitz," without conceding his eligibility for citizenship, and affirmed to the court that "upon [Itzcovitz's] return" he would "not be subject to an exclusion proceeding and will be deemed to have resumed his permanent resident status." Subsequently, on February 10, 1970, the District Director of INS notified the United States Attorney for the Southern District of New York that "steps have been initiated to have Mr. Itzcovitz's name removed from our Service lookout book." He had returned on January 24, 1970. His appeal was then dismissed as moot by the panel in a per curiam opinion noting that "the government has conceded the propriety of admitting Itzcovitz into the country, and the parties have informed us of his return." Itzcovitz v. Selective Service Local Board No. 6, 422 F.2d 828 (2d Cir. 1970).

Only after the Immigration Service had ignored letters written on March 12, June 18 and September 23, 1970, inquiring whether a brief departure from the country would result in his classification as an excludable alien on his return, did appellant institute this action for declaratory judgment. Appellant alleges that he is employed by El Al Israel Airlines as a passenger agent at Kennedy International Airport, and that one of El Al's employment requirements is a three-week course, given in Tel Aviv, on the

prevention of airline hijackings. El Al requested that the plaintiff attend a session to be conducted from October 18 until November 10, 1970.[6]

Both appellant and INS moved for summary judgment below, INS claiming, among other things, that as an alien ineligible for citizenship under § 315(a) of the Act, 8 U.S.C. § 1426(a), Itzcovitz may be an excludable alien under § 212(a) of the Act, 8 U.S.C. § 1182(a) (22).

We disagree with the conclusion of the court below that this controversy is not ripe for adjudication. Having once been unlawfully excluded, appellant rightfully wonders whether a two- or three-week departure on employer's business would raise again the spectre of exclusion, this time possibly without the grace of an INS retrenchment allowing appellant to re-enter and resume his status as a permanent resident alien. The Immigration Service admits and makes it very clear—clearer to us, perhaps, than it did to the court below— that it would seek to exclude appellant after his sojourn in Tel Aviv. Abbott Laboratories, Inc. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), tells us that the ripeness doctrine "is to prevent the courts * * * from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized * * *." We are required to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. 149, 87 S.Ct. 1515.

■ We believe there is hardship in the case of this appellant, who has spent

years seeking to retain his permanent resident alien status and is still left to guess whether he can go to Israel for a brief training course required by his employer. His case is not abstract, nor the issue without immediate concurrent significance. The issue is one which the courts can and appropriately should decide. Cf. Loos v. INS, 407 F.2d 651 (7th Cir.), cert. denied, 396 U.S. 877, 90 S.Ct. 150, 24 L.Ed.2d 135 (1969).[7] The Government's suggestion that within two years the appellant could apply to the Attorney General for a waiver of the excludability bar under 8 U.S.C. § 1182(c) is not meaningful since such a waiver can be applied for only by an alien who has voluntarily proceeded abroad, thus subjecting himself to exclusion. Similarly, the Government's suggestion that within 3½ years appellant could apply for citizenship under 8 U.S. C. § 1427(a) and thus obtain administrative and judicial review then is without merit, for on such an application the only issue would be whether he were validly declared ineligible for citizenship, a point which he concedes, and it would be unnecessary at the hearing thereon to reach the question of his excludability as an alien if he departed from the United States. This is a proper case for declaratory relief under 28 U.S.C. § 2201.

■ We do not reach the question of the apparent clash between appellant's rights under the treaty and the immigration laws, for we conclude that appellant's return to the United States after his proposed trip to Tel Aviv would not constitute an "entry" within § 101(a) (13) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101(a) (13),[8] and the INS would therefore have no

6. This time has been extended, we were advised on oral argument, by the employer, and this opinion assumes that such an extension is in effect.

7. While ILWU Local 37 v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954), has never been expressly overruled, it has been politely overlooked by the Supreme Court for at least ten years.

8. The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien

authority to exclude him under § 212, 8 U.S.C. § 1182, Rosenberg v. Fleuti, 374 U.S. 449, 452, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). We reach this result having in mind not the history of Itzcovitz's case but the history of § 101(a) (13) of the Act. As early as 1947, this court, in an opinion by Chief Judge Learned Hand, held that an alien convicted of robbery did not re-enter the United States when he went by sleeping car from Buffalo to Detroit, passing through Canada en route. Di Pasquale v. Karnuth, 158 F.2d 878 (2d Cir. 1947). The alien was held to have "a vested interest in his residence," and was not to "be subject to meaningless and irrational hazards"; while he could have learned by inquiry that the train would take him out of the United States and back into it, there was no evidence that he "knew or had any intention of leaving the United States or of entering Canada." 158 F.2d at 878–879. Pointing out that "[d]eportation can be the equivalent of banishment or exile," the Supreme Court eleven months after Di Pasquale, supra, relied upon it and followed it, in Delgadillo v. Carmichael, 332 U.S. 388, 391, 68 S.Ct. 10, 12, 92 L.Ed. 17 (1947). There an alien merchant seaman, also later convicted of robbery, was rescued after his ship was torpedoed in World War II and taken to Havana, Cuba; his re-entry into the United States by way of Florida was held not to be an "entry" within the Act as it then read, the Court noting that "the exigencies of war, not his voluntary act, put him on foreign soil." 332 U.S. at 391, 68 S.Ct. at 12. In Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), the Supreme Court held an alien lawfully admitted to permanent residence was not deprived of the rights of a resident upon his return to the United States from a voyage as a merchant seaman when he had stopped at but remained aboard the vessel at foreign ports of call. The Court found the alien entitled, under the due process clause of the Fifth Amendment, to a hearing on his objections to deportation, a right he would not have enjoyed without his resident status. In a 5–4 decision the Supreme Court in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S. Ct. 625, 97 L.Ed. 956 (1953), held that an alien who had traveled abroad and remained in Hungary for nineteen months could be treated as an "entering alien," and be detained on Ellis Island without a hearing on his threatened exclusion. 345 U.S. at 213, 73 S.Ct. 625. Kwong Hai Chew was distinguished by the majority on the grounds that Kwong's maritime service was continuous residence for naturalization purposes and that Kwong was pursuing his vocation for four months aboard an American ship. 345 U.S. at 213–214, 73 S.Ct. 625. Mezei did not affect the holdings in Delgadillo, Di Pasquale, or other cases following them, e. g., Carmichael v. Delaney, 170 F.2d 239 (9th Cir. 1948) (no "entry" occurred after ship to which resident alien was assigned stopped at many ports and alien debarked, because of ship movements pursuant to Navy orders); Yukio Chai v. Bonham, 165 F.2d 207 (9th Cir. 1947) (no "entry" occurred after ship carrying resident alien back from seasonal cannery work in Alaska made unscheduled stop in Vancouver, B. C.). In Savoretti v. United States ex rel. Pincus, 214 F.2d 314 (5th Cir. 1954), decided after Mezei but relying on Delgadillo and Di Pasquale, a resident alien was held not to have made a new entry after the fishing boat on which he was sleeping (after some serious drinking) made an unscheduled stop in Bimini to sit out heavy weather. Delgadillo and Di Pasquale, in fact, were

proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided,* That no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception.

8 U.S.C. § 1101(a) (13).

incorporated into the 1952 Immigration and Nationality Act by § 101(a) (13), 8 U.S.C. § 1101(a) (13), which provides that an alien

> shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves * * * that his departure * * * was not intended or reasonably to be expected by him or his presence in a foreign port or place * * * was not voluntary.

Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804 (1963) (5–4) construed this provision to mean that a resident alien had not made an "entry" when he returned to the United States from a two hour trip to Ensenada, Mexico. The Court, relying on both *Delgadillo* and *Di Pasquale*, examined extensively the legislative history, saying

> The most basic guide to congressional intent as to the reach of the exceptions is the eloquent language of *Di Pasquale* and *Delgadillo* themselves, beginning with the recognition that the "interests at stake" for the resident alien are "momentous," 158 F.2d, at 879, and that "[t]he stakes are indeed high and momentous for the alien who has acquired his residence here," 332 U.S., at 391, 68 S.Ct. 12. This general premise of the two decisions impelled the more general conclusion that "it is * * * important that the continued enjoyment of * * * [our] hospitality once granted, shall not be subject to meaningless and irrational hazards." 158 F.2d at 879. See also *Delgadillo, supra*, 332 U.S. at 391, 68 S.Ct. 12. Coupling these essential principles of the two decisions explicitly approved by Congress in enacting § 101(a) (13) with the more general observation, appearing in *Delgadillo* as well as elsewhere, that "[d]eportation can be the equivalent of banishment or exile," it is difficult to conceive that Congress meant its approval of the liberalization wrought by *Di Pasquale* and *Delgadillo* to be interpreted mechanisti-

cally to apply only to cases presenting factual situations identical to what was involved in those two decisions.

> 374 U.S. at 458–459, 83 S.Ct. at 1810 (footnote omitted).

The decision concludes, significantly for our case, "that it effectuates congressional purpose to construe the intent exception to § 101(a) (13) as meaning an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." 374 U.S. at 462, 83 S.Ct. at 1812. The Court mentions three factors —the length of time of absence, the purpose of the visit, and the necessity of procuring travel documents, *id.*, but leaves the development of these and "other possibly relevant" factors to "'the gradual process of judicial inclusion and exclusion,' Davidson v. New Orleans, 96 U.S. 97, 104 * * *., 24 L. Ed. 616." 374 U.S. at 462, 83 S.Ct. at 1812.

That process helps to point the way for us.

The Ninth Circuit, following *Di Pasquale* and *Fleuti, supra,* in Wadman v. INS, 329 F.2d 812 (9th Cir. 1964), held that a five day absence from the United States by an alien vacationing in Mexico was not an interruption of "continuous" physical presence permitting deportation. Even more apposite, perhaps, is the Seventh Circuit decision in Zimmerman v. Lehmann, 339 F.2d 943 (7th Cir.), cert. denied, 381 U.S. 925, 85 S.Ct. 1559, 14 L.Ed.2d 683 (1965). There the court, quoting at length from *Fleuti*, held that neither a five- or six-day "harmless, innocent" vacation in Canada in 1952 nor a less than 24-hour trip to Canada in 1953 constituted an illegal "entry" within § 101(a) (13) of the Immigration and Nationality Act of 1952.

We believe the Congressional purpose underlying the Act would best be served by a similar holding here. The time factor is, to be sure, longer than in *Zimmerman*, *Wadman* or *Fleuti*, but it is still limited to three weeks, and is fairly characterized as only temporary. The

purpose of Itzcovitz's planned trip is in a real sense for the benefit of his employer; he is not merely vacationing, as were the petitioners in the other cases just mentioned. True, he doesn't have to go, but whether he would be able to keep his job, much less advance himself, without going to Tel Aviv is doubtful.[9] In any event, he has been directed by his employer to go. In a general sense Itzcovitz "intends" to go to Tel Aviv, just as Fleuti intended to go to Mexico. But appellant is not in the posture of having taken the trip in disregard of the immigration consequences; rather he has here sought relief in advance. The purpose of his trip is entirely *bona fide*, honorable and lawful. He has every intention of retaining permanently his residence in the United States. And, indeed, the sole purpose of the three week trip is to qualify him for more useful employment service as he continues his permanent residence. Under these circumstances—and we consider them limited—we do not think appellant's trip to Tel Aviv will be "meaningfully interruptive" of his permanent residence "within the meaning and ameliorative intent of the exception to § 101(a) (13)." Rosenberg v. Fleuti, *supra*, 374 U.S. at 461, 462, 83 S.Ct. at 1812.

Our task in this, a case of statutory interpretation, has been made a little easier since Congress has had the gloss of *Fleuti* before it, for seven years, without tightening subsection (13) of the statute, or indeed changing it, even while changing provision after provision of subdivision (a) of § 101.[10]

Accordingly, we reverse and remand with direction to the court below to grant appellant's motion for summary judgment and declare that appellant may take his proposed business trip.

9. Appellant's reply brief states that counsel has been informed that Itzcovitz's future with El Al "is contingent upon his ability to undergo such training in Tel Aviv." But we not rest our holding on this narrow an interpretation of § 101(a) (13).

10. See Historical Note, following 8 U.S. C.A. § 1101.