551 F.2d 495
 Heinz H. HEITLAND (A17 587 648) and Hennelore Heitland (A19
492 601), Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 293, Docket 76-4141.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 8, 1976.
Decided Jan. 27, 1977.
 
 Jules E. Coven, New York City (Abraham Lebenkoff, Lebenkoff & Coven, New York City, of counsel), for petitioners.
 Robert S. Groban, Jr., Sp. Asst. U. S. Atty. (Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, Mary P. Maguire, Sp. Asst. U. S. Atty., New York City, of counsel), for respondent.
 Before KAUFMAN, Chief Judge, and MANSFIELD and MESKILL, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 Pursuant to § 106 of the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1105a, Heinz H. Heitland and his wife, Hennelore, seek review of an order of deportation entered by the Board of Immigration Appeals (the "Board") on January 25, 1974, in accordance with a Board decision denying their applications, pursuant to § 245 of the Act, 8 U.S.C. § 1255(a),[1] for adjustment of their immigration status from that of non-immigrants admitted as temporary visitors under § 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2), who had remained beyond their authorized stay, to that of aliens lawfully admitted for permanent residence. The case had been remanded to the Immigration Judge to determine whether they were eligible for discretionary relief from deportation. The Heitlands also seek review of the Board order dated April 13, 1976, denying their applications pursuant to § 244 of the Act, 8 U.S.C. § 1254(a), for suspension of deportation in the discretion of the Attorney General.[2] For the reasons stated below, we affirm both orders.
 
 
 2
 Heinz H. Heitland was born in Germany in 1932 and after his first marriage moved with his wife to Canada, where his first child was born, and became a naturalized Canadian citizen. Following a divorce in Canada from his first wife in 1962, he married petitioner Hennelore Heitland, a native and citizen of Germany, in Canada in 1963.
 
 
 3
 In 1968 Heitland and his second wife were admitted to the United States as nonimmigrant visitors, permitted to remain for not more than six months.[3] Except for approximately six weeks in December, 1970, they have without permission remained here ever since. Shortly after their arrival they moved to Brooklyn, illegally obtained employment,[4] and filed with the Immigration and Naturalization Service an application for adjustment of Mr. Heitland's status on the basis of his employment as a mechanic. In August, 1968, however, he left this job, purchased a Volkswagen truck[5] and went into the business of delivering letters and small packages, thus abandoning his first effort to obtain an adjustment of status, for which he would not have been eligible unless he could submit a certification by the Secretary of Labor to the Attorney General pursuant to § 212(a) of the Act, 8 U.S.C. § 1182(a), and 29 C.F.R. § 60.3(c), to the effect that he was needed for the job on which he was employed.[6]
 
 
 4
 In July, 1969, Mrs. Heitland gave birth to their daughter in Brooklyn. Meanwhile Mr. Heitland continued operating his panel truck with its two-way radio as a one-man delivery service, obtaining most of his business from the Mid-Island Messenger Company, which paid him 60 percent of receipts realized from his deliveries. In 1970 his receipts from this business were approximately $14,000, from which he netted about $4,500. In 1971 he bought a second truck for $3,022 for use in his business, paying $250 down and financing the balance through an auto loan.
 
 
 5
 In December, 1970, the Heitlands and their daughter, a United States citizen by birth, went to Germany for six weeks on an emergency trip to see his ailing sister. On February 4, 1971, they returned, Mr. Heitland travelling on a Canadian passport he had obtained in New York in October, 1970, his wife on her German passport and their child on her United States passport. While in Germany, Mrs. Heitland obtained a non-immigrant visitor's visa authorizing her to enter the United States and remain until August, 1971, and was admitted as a temporary visitor upon their return to the United States in 1971. Mr. Heitland was admitted to the United States as a non-immigrant in transit to Canada, and their child as a United States citizen. The Heitlands then resumed residence at the Brooklyn apartment where they had previously and have since resided.
 
 
 6
 In April 1971, the Immigration and Naturalization Service instituted deportation proceedings against Mr. Heitland, alleging he had entered the United States in February 1971 with the intention of remaining here indefinitely without a valid immigration visa or permanent-entry document. He conceded his deportability by admitting these allegations but countered by filing another application for change of status, claiming that his wife and he were eligible under § 212(a)(14) of the Act for non-preference quota immigrant visas entitling them to status as permanent residents, see § 203(a)(8) of the Act, 8 U.S.C. § 1153(a)(8), on the ground that he was exempted from the requirement of obtaining a labor certification under § 212(a)(14) of the Act because he was engaged "in a commercial . . . enterprise in which he had invested . . . a substantial amount of capital" and thus had created new employment rather than having taken away an existing job opportunity. See 8 C.F.R. § 212.8(b)(4).[7] He claimed eligibility for his wife as his dependent. The Immigration and Naturalization Service then instituted deportation proceedings against Mrs. Heitland, alleging she had remained in the United States beyond August 3, 1971, without permission. Upon her admission that she had remained beyond the authorized period she was joined with her husband in his pending application for change of status.
 
 
 7
 On October 4, 1972, the Immigration Judge found the Heitlands deportable but eligible as investors for change of status under 8 C.F.R. § 212.8(b)(4), based on Mr. Heitland's delivery business, and recommended that the application for change of status be granted. The Board, however, on January 25, 1974, sustained the INS's position on appeal, holding that the investment made by the Heitlands in delivery vans was not sufficiently substantial to satisfy the requirements of 8 C.F.R. § 212.8(b)(4). In the light of Congress' desire to safeguard existing employment, the Board interpreted the regulation as requiring an investment that would expand existing jobs and thereby offset the adverse impact which the alien's employment might have on the job market. Although the Board thus denied the Heitlands an adjustment of status, it nevertheless remanded the case to the Immigration Judge to determine whether the Heitlands were entitled to discretionary relief from deportation under § 244(a)(1) of the Act. In the meantime, in December, 1973, Mr. Heitland was injured in an automobile accident, which forced him to terminate his delivery service.
 
 
 8
 Upon remand the Heitlands in 1975 reapplied to the INS for adjustment of status and also sought suspension of deportation pursuant to § 244(a)(1) of the Act, 8 U.S.C. § 1254(a)(1), which authorizes the INS in its discretion to grant relief from deportation upon proof (1) that the petitioners have been present in the United States for a continuous period of not less than seven years preceding their application, (2) that they are of good moral character, and (3) that their deportation would result in extreme hardship to themselves or to their citizen child. On November 18, 1975, the Immigration Judge denied the Heitlands' latest applications for adjustment of status on the ground that Mr. Heitland's accident had precluded him from continuing his delivery service. The application for discretionary suspension of deportation was also denied on the ground that the Heitlands' six-week trip to Germany in 1970-71 interrupted their presence in the United States, precluding them from showing that they had "been physically present for a continuous period of not less than seven years immediately preceding the date of such application" as required by § 244(a).
 
 
 9
 On April 13, 1976, the Board dismissed the Heitlands' appeal from the Immigration Judge's decision denying suspension of a deportation and held that the visit to Germany constituted a "meaningful interruption" of the continuity of their stay in the United States. On June 4, 1976, the Heitlands filed in this court their petition for review of the Board's January 25, 1974, and April 13, 1976, decisions, which automatically stayed deportation pending our review, see § 106(a)(3) of the Act, 8 U.S.C. § 1105a(a)(3).
 
 DISCUSSION
 
 10
 A threshold question is whether we have jurisdiction to review the Board's January 25, 1974, decision reversing the Immigration Judge's decision and denying the Heitlands an adjustment of status. The Board contends that review is precluded by § 106(a)(1) of the Act, 8 U.S.C. § 1105(a)(1), which requires that the petition for review be filed not later than six months from the date of the final deportation order. See United States ex rel. Tanfara v. Esperdy, 347 F.2d 149 (2d Cir. 1965). Since the Board's January 25, 1974, decision constituted a final order in that appeal, see Foti v. Immigration and Naturalization Service, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), and the Heitlands did not file their petition for review for 21/2 years thereafter, the Board argues that the petition must be dismissed. We disagree.
 
 
 11
 Although the Board's January 25, 1974, decision denied a status change, it cannot be labelled "final" because it also remanded the case to the Immigration Judge to determine whether deportation should be suspended under § 244(a)(1). Had the latter relief been granted, the effect might have been to render unnecessary any review of the earlier order. On the other hand, had suspension been denied (as actually occurred), both decisions would be reviewable simultaneously rather than in piecemeal fashion. Accordingly we hold that, in view of the Board's remand, the only final order of deportation was that entered on April 13, 1976, from which the Heitlands took a timely appeal. It therefore becomes unnecessary for us to decide whether they had exhausted their administrative remedies with respect to their third application for adjustment of status, which was made to the Immigration Judge upon the remand ordered by the Board. For present purposes, this latter petition is significant only as further evidence that they had not waived or abandoned their earlier claim for adjustment of status.
 
 
 12
 Turning to the Board's denial of petitioners' application for adjustment of status under § 245 of the Act, it is undisputed that, following his 1968 entry into the United States, Mr. Heitland needed employment to support himself and his family and that he did not obtain a certification from the Secretary of Labor under § 212 of the Act which would enable him to perform skilled or unskilled labor. However, he contends that the Board erred in concluding that his investment in vehicles for operation of his one-man delivery service was insufficient to gain him an exemption from the labor certification requirement as an "investor" within the meaning of 8 C.F.R. § 212.8(b)(4) as it existed prior to January 12, 1973, which was more favorable to him than the regulation as it was later amended. We disagree.
 
 
 13
 The Board's interpretation of the INS's regulation, which is entitled to considerable weight, appears to be reasonable and supported by substantial evidence. See § 106(a)(4) of the Act, 8 U.S.C. § 1105a(a)(4); Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 286, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). Whether an investment is "substantial" within the meaning of the regulation depends upon its likelihood of creating new jobs, as distinguished from merely taking advantage of existing employment opportunities by filling them with persons who perform labor or render services as independent contractors rather than as employees. To permit the latter would be to circumvent the purpose of the regulation, which is to protect American workers from unemployment attributable to an influx of aliens competing for a limited number of jobs. United States v. Londono, 433 F.2d 635 (2d Cir. 1970) (per curiam). In the present case, Mr. Heitland's cash outlay for the two vehicles used in his delivery service totalled $953.97, plus bank loans amounting to $4,772.70.[8] Most of his delivery business was not obtained from sources which had not previously employed persons to make deliveries, but from the Mid-Island Messenger Company, which was engaged in the delivery business. Instead of itself delivering the messages or packages, Mid-Island employed Heitland to do so, for which it paid him 60 percent of the receipts from such deliveries.
 
 
 14
 Thus it could reasonably be inferred that Heitland was not creating a new job but merely performing a service that would otherwise have been rendered by Mid-Island, either directly or through one or more of the many other competing delivery service drivers. The threat to existing employment of resident American workers remained the same, whether they were labelled "employees," "workers," "independent contractors" or "businesses." Absent some expansion of the market or increase in job opportunities, the existing work force would be adversely affected by the alien's entry. In any event, Mr. Heitland's December, 1973, automobile accident terminated his one-man delivery service, leaving him unfortunately dependent upon disability payments, his wife's salary and their limited capital.[9] Accordingly we affirm the Board's holding to the effect that Mr. Heitland does not qualify for the "investor" exemption provided by 8 C.F.R. § 212.8(b)(4).
 
 
 15
 The eligibility of the Heitlands for discretionary suspension of deportation pursuant to § 244(a)(1) of the Act presents a more difficult question. Since the Board denied their application solely on the ground that their six-week trip to Germany at the end of 1970 precluded their showing seven years continuous presence in the United States, the issue turns on the significance of that absence and on whether the Heitlands sustained their burden, see Ex parte Orlando, 131 F.Supp. 485 (S.D.N.Y.), affd., 222 F.2d 537 (2d Cir.), cert. denied, 350 U.S. 862, 76 S.Ct. 103, 100 L.Ed. 764 (1954), of proving that it did not meaningfully interrupt the continuity of their presence.
 
 
 16
 In Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), the Supreme Court held that the return to the United States of an alien who had been a lawful permanent resident of the United States, after a visit for "about a couple of hours" to Mexico, did not constitute an "entry" as that term is defined in § 101(a)(13) of the Act.[10] If it constituted a new "entry" the alien might be excludable because of an intervening disability, despite the legality of his original entry and later presence in the United States. The Court reasoned that the question turned on whether the alien could upon remand prove that "his departure to a foreign port or place . . . was not intended," as that phrase was used in the statute, and that this issue should be resolved by reference to various factors relevant to the meaningfulness of the interruption, including the length of his absence, whether his purpose was "to accomplish some object . . . contrary to some policy reflected in our immigration laws," and whether the alien engaged in conduct, such as procurement of travel documents, indicating deliberateness and an appreciation for the implications of his departure. 374 U.S. at 462, 83 S.Ct. at 1812. The Court declared that since an absence which was "an innocent, casual and brief excursion" could not be classified as an "intended" departure, it would not be "meaningfully interruptive" of his unlawful permanent residence. Said the Court:
 
 
 17
 "The more civilized application of our immigration laws given recognition by Congress in § 101(a)(13) and other provisions of the 1952 Act protects the resident alien from unsuspected risks and unintended consequences of such a wholly innocent action." 374 U.S. at 462, 83 S.Ct. at 1812.
 
 
 18
 In Wadman v. Immigration and Naturalization Service, 329 F.2d 812 (9th Cir. 1964), the Ninth Circuit applied these principles in construing the term "continuous period of not less than seven years" as used in § 244(a)(1) of the Act (the section at issue in this case), holding that an alien's ten-day vacation trip, five days of which were spent in Mexico, did not interrupt the continuity of his presence in the United States sufficiently to preclude discretionary relief, stating:
 
 
 19
 "In our judgment the term 'continuous' is no more subject to a hard and fast construction than is the term 'intended.' The question is whether the interruption, viewed in balance with its consequences, can be said to have been a significant one under the guides laid down in Fleuti." 329 F.2d at 816.
 
 
 20
 We agree that Rosenberg v. Fleuti, although construing a different section of the Act, supports a liberal rather than a niggardly or technical construction of the phrase "continuous period" as used in § 244(a)(1). The continuous presence of an alien as a resident in the United States for a long period is undoubtedly one factor of importance in determining whether deportation would result in an unusually severe hardship. Deportation of an alien who had resided in the United States for but a few months, for instance, would not be likely to result in as much hardship as for one who had resided in this country without interruption for seven years. Similarly, deportation of an alien who had accumulated seven years of fragmented residence in the United States, interrupted by frequent or long absences abroad, would not be expected to work as much hardship upon him as might result if he had resided in this country for an unbroken seven-year period, since the latter might reduce the likelihood of his being able to establish his home elsewhere. The statute surely was not designed to protect the wanderers or the rootless. Hence Congress used the word "continuous." On the other hand, to deny a person the benefits of seven years' continuous residence because of one or two short interruptions might well defeat the purpose of § 244(a)(1), since the hardship in such a case would not be substantially different from that where the presence has been uninterrupted.
 
 
 21
 Applying these principles to the present case, we agree with the Board, after consideration of all of the relevant factors, that the Heitlands' six-week visit to Germany was "meaningfully interruptive" of their presence in the United States, and that the Heitlands have therefore failed to sustain their burden of demonstrating eligibility for the benefits of § 244(a).
 
 
 22
 It is true that at all relevant times the Heitlands intended to make Brooklyn their permanent residence, that their six-week trip to Germany at the end of 1970 was apparently for the purpose of visiting with his ailing sister,[11] which was consistent with their intent to return and resume residence in the United States, and that they did indeed return. However, while these circumstances might favor application of the liberal principles of Fleuti to preserve the continuity of their presence, other relevant factors militate strongly against such a result. First is the fact that, unlike the petitioners in Fleuti and Wadman, who were at all times lawful permanent resident aliens prior to their departure, the Heitlands, once they remained beyond the six-month period for which they were originally admitted to stay in the United States, were at all times present in this country in violation of its laws. Even assuming that their illegal presence, standing alone, might not preclude § 244(a) eligibility, see Git Foo Wong v. Immigration and Naturalization Service, 358 F.2d 151, 153 (9th Cir. 1966), they had no reasonable basis to expect the government to permit them to further remain in the United States, much less for a continuous period of seven years, or to readmit them upon their return from Germany. Further assuming the petitioner might have become a permanent resident based on his application for adjustment of status by virtue of his employment as a mechanic, that application became moot when he left employment with the union that had sponsored him and started his own delivery business. According to the government, all documents that had been submitted to the INS in support of that application were returned in August, 1968. Thereafter, with no legal right to reside in the United States, the Heitlands nevertheless remained for the next two years, risking deportation, without applying for permission to stay or for change of status until deportation proceedings were instituted against them in 1971, shortly after their return from Germany. While their motive may be understandable, the circumstances hardly add up to an injustice of the type found in Fleuti, Wadman and similar cases where permanent resident aliens, who had the right to reside in the United States, would not have been subject to deportation if they had simply remained within this country's borders. The aliens in those cases, unlike the Heitlands, were truly the victims of "unsuspected risks and unintended consequences," 374 U.S. at 462, 83 S.Ct. 1804, and the hardship to them was far greater than that faced by the Heitlands, who had no right at all to reside in this country at the time of their departure for their native land, Germany.
 
 
 23
 The interruptive significance of the Heitlands' six-week visit to Germany is further evidenced by the deliberateness with which it was undertaken and the implicit misrepresentations used to secure their return to the United States. This was no sudden, spur-of-the-moment holiday or trip across the border into Mexico or Canada, undertaken without appreciating the consequences and without any travel papers other than a state automobile license or some other evidence of residence in the United States. In order to proceed to Germany, the petitioners had to obtain passports and visas, which is a far cry from the situation in Fleuti. Indeed, the Court there emphasized the significance of such conduct, stating:
 
 
 24
 "Still another (relevant factor) is whether the alien has to procure any travel documents in order to make his trip, since the need to obtain such items might well cause the alien to consider more fully the implications involved in his leaving the country." 374 U.S. at 462, 83 S.Ct. at 1812.
 
 
 25
 Aware that they had been illegal residents of the United States for some years, the Heitlands, in order to leave the country for a substantial period and gain return without exposing their deportability, had to resort to maneuvers that hardly bear the hallmarks of innocence. Lacking any right to return to the United States as a lawful resident, Mr. Heitland, according to his sworn statement to the INS, gained entry on his Canadian passport as a non-immigrant in transit to Canada, see 8 C.F.R. §§ 212.1(a) and (e)(1), when, in fact, he had no intention of proceeding to Canada. His plan was to return to his Brooklyn residence and remain permanently in the United States. Similarly, Heitland admitted that his wife, returning on her German passport, gained entry on the basis of a temporary non-immigrant visitor's visa obtained by her in Germany from the United States Consulate. Although she thus represented expressly or impliedly that she was going to the United States as a visitor (authorized to stay not more than six months) she in fact intended to resume permanent residence in Brooklyn. She simply planned to repeat what she had done three years earlier overstay her "visit" and remain unlawfully in the United States. There is no evidence that the INS, upon admitting the Heitlands for the limited time and purposes indicated by their papers, knew of their Brooklyn residence or of their intent to remain permanently.[12]
 
 
 26
 In short, in using implicitly deceptive methods to secure re-entry in the United States, the Heitlands were engaged in a course of conduct directly contrary to a "policy reflected in our immigration laws," 374 U.S. at 462, 83 S.Ct. at 1812. To permit them to treat their six-week absence and re-entry as if these events had never occurred would be to reward them for what amounted to misleading conduct and would render meaningless the express requirement that the seven-year residence be "continuous." The implicitly fraudulent circumstances of their return, when considered with the admitted illegality of their presence in the United States before their departure and the substantial period of time for which they absented themselves, do not present a picture of the type of hardship or injustice which Fleuti or its progeny were intended to remedy. This was a substantial and deliberate interruption of an illegal presence in the United States, accomplished through consciously misleading conduct.
 
 
 27
 In concluding that the Heitlands are not eligible for suspension, we do not hold that an absence longer than the few hours in Fleuti or the five days in Wadman necessarily constitutes a "meaningful interruption" of an alien's continuous presence in the United States. As the Supreme Court made clear in Fleuti the significance of an absence will depend upon the relevant factors and circumstances found in each case. In Wong v. Immigration and Naturalization Service, 363 F.2d 234 (9th Cir. 1966), for instance, the Ninth Circuit held that the unexpected six-month absence of a 16-year old youth in Canada, which was neither voluntary nor with an appreciation for the consequences but by order of his foster parents, did not necessarily constitute a meaningful break of his continuous presence in the United States under § 244(a)(1) and remanded the case to the Board for a hearing on the issue of his intent. Similarly, in Itzcovitz v. Selective Service Local Bd. No. 6, N.Y., N.Y., 447 F.2d 888 (2d Cir. 1971), we held that a permanent resident alien lawfully in the United States might go for two or three weeks to a special training course in Israel at his employer's discretion without risking exclusion on the grounds that while in the United States he had exercised his treaty right to claim exemption from United States military service. However, these decisions are clearly distinguishable from the present case and did not involve illegality of the type which characterized the Heitlands' presence in the United States or misleading conduct of the type inherent in their return. Indeed, in Itzcovitz we expressly noted that "The purpose of his (the alien's) trip is entirely bona fide, honorable and lawful . . . indeed, the sole purpose of the three week trip is to qualify him for more useful employment service as he continues his permanent residence." 447 F.2d at 894.
 
 
 28
 For these reasons we affirm the Board's order denying suspension of deportation.
 
 IRVING R. KAUFMAN, Chief Judge (dissenting):
 
 29
 The majority holds that Heinz and Hennelore Heitland, apparently outstanding members of their community[1] and parents of a 7-year old daughter who was born and has lived all her life in New York, may not even appeal to the Attorney General for discretionary suspension of deportation. It takes this rigid position because it is of the view that the Heitlands' six-week trip to Germany in 1971-72 to visit Heinz's sick and, as it then appeared, possibly dying sister "meaningfully interrupted" their seven year continuous presence in the United States. I cannot agree that anything in the Immigration and Nationality Act compels such a harsh result, and accordingly I dissent.
 
 I.
 
 30
 Section 244(a) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a), provides
 
 
 31
 . . . the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and
 
 
 32
 (1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence . . . .
 
 
 33
 The obvious purpose of this provision was to enable the Attorney General to mitigate the egregious result of a relentless application of the deportation law to a class of potentially deserving cases. Wadman v. Immigration and Naturalization Service, 329 F.2d 812, 817 (9th Cir. 1964). Of course, as the majority felicitously observes, the statute was not designed to protect the "wanderers and the rootless". It was, however, intended to protect those who, like the Heitlands, have established solid roots in their communities over a seven-year period.
 
 
 34
 The majority apparently agrees that interpreting the Act's "continuous presence" requirement rigidly would frustrate the liberal purpose of § 244(a) at least for aliens lawfully present in this country ab initio. But my brothers appear to favor a more niggardly rule where an alien's initial presence in the United States is unlawful. Despite the intimation to the contrary, I trust my brothers would not go so far as to hold aliens not properly admitted to the United States completely bereft of protection from the unfair consequences of a literal reading of "continuous presence". See Git Foo Wong v. Immigration and Naturalization Service, 358 F.2d 151 (9th Cir. 1966). On the other hand, it seems absolutely clear that the Heitlands' trip to Germany would not be regarded "meaningfully interruptive" of their presence here if they had been lawfully admitted, even if, as in Itzcovitz v. Selective Service Local Board No. 6, 447 F.2d 888 (2d Cir. 1971), they had foreseen possible immigration problems.[2] Accordingly, the majority appears to espouse the rule that persons illegally in this country may not leave for more than the few hours involved in Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), though people legally resident here may interrupt their residency for much longer periods of time, as in Itzcovitz.
 
 
 35
 This distinction is, of course, entirely devoid of support in the language of the statute. And, insofar as it is based upon a comparison of the relative hardship of deporting legal residents and those with no legitimate expectation of remaining here, I believe the entire subject is more appropriately left to the Attorney General's discretion.
 
 
 36
 The wisdom of leaving an evaluation of hardships to the discretion of the Attorney General is especially patent on the facts presented here. My brother Mansfield's scholarly opinion makes much of the Government's assertion that Mr. Heitland's initial papers seeking lawful permanent residence were returned to him in 1968. Accordingly, in the majority's view, the Heitlands must have known that their presence here may have been subject to brusk intervention by the Immigration and Naturalization Service, and cannot, therefore, have developed the psychological ties to the community that the statute presupposes. But, there is not a shred of evidence in the record that the Heitlands were ever informed of the Service's failure to process Mr. Heitland's application. The Government concedes that the papers were not returned to Mr. Heitland personally, but to his former labor union which had made the application on his behalf. Thus, we do not have any reason to doubt Mr. Heitland's claim that he believed his application for permanent residence was caught up in the toils of the immigration bureaucracy. And, indeed, both Mr. Heitland's inquiry on November 3, 1968, requesting information concerning "his" application and his subsequent voluntary inquiry in the winter of 1972 suggest Mr. Heitland is telling the truth. We, of course, are ill-equipped to evaluate such factors in fulfilling our duty of applying the language of the statute. Such considerations should be left to the sensitive judgment of the Attorney General. The unfortunate result of the majority's decision is that it prevents this and other potentially meritorious cases from ever reaching the Attorney General's consideration.
 
 II.
 
 37
 The majority also relies on the Heitlands' alleged deception in securing reentry into the United States to demonstrate they were engaged in "a course of conduct directly contrary to a 'policy reflected in our immigration laws' ". I simply cannot understand how this position can be maintained on the record before us. There is not a shred of evidence that Mr. and Mrs. Heitland lied to anyone so that they could reenter the United States. On the contrary, when questioned by the customs inspector at Kennedy airport, Mr. Heitland was very candid about his intention to return to his home in Brooklyn,[3] and, indeed, several days later he voluntarily went to the Immigration Service to clarify what he thought was confusion regarding his status. I can only assume that my brothers agree with this reading of the record, since they do not refer to any actual misrepresentation but rely on "implicit" deception. I do not believe this record supports an inference that there was any deception.
 
 
 38
 Nor, in any event, can the Heitlands justly be accused of conduct subversive of the immigration laws. Their purpose in leaving the country was not to smuggle other aliens in, or to accomplish any other illegal or immoral objective. See, e. g., Solis-Davila v. Immigration and Naturalization Service, 456 F.2d 424 (5th Cir. 1972). They took the unhappy voyage to visit a sister whom the Heitlands believed to be affected with a fatal illness. In the absence of any actual deception, the Heitlands' sole misconduct was their desire to return to their home in the United States. The "implicit" fraud here would exist whenever a person illegally in this country ventured abroad and sought to return.
 
 III.
 
 39
 Finally, it is clear that a permanent resident alien may travel to faraway places for substantial periods of time, fully aware that his departure involves potential immigration problems, without meaningfully interrupting the continuity of his presence in the United States. Itzcovitz v. Selective Service Local Board No. 6, supra. The Court decides today, ostensibly to avoid rendering "meaningless the express requirement that the seven-year residence be 'continuous' ", that an alien residing unlawfully in the United States does not have the same right to a liberal interpretation of "continuity." I believe this distinction is unjustified by the statute, which pointedly refrains from making eligibility for suspension of deportation rest on the legality of an alien's initial entry. In using the word "presence" Congress surely envisioned that those unlawfully in the United States had the right to take full advantage of the liberal provision of § 244(a).
 
 
 40
 I would hold, on the facts presented to us here, that the Heitlands' compelling voyage to Germany did not meaningfully interrupt their seven-year presence in the United States.[4] This holding, of course, would signify only that the Heitlands were eligible to apply for suspension of deportation. If, as the majority appears to believe, they are undeserving, I am sure that the Attorney General, after a hearing in which the record could be clarified, would deny their application. But I cannot agree that the Heitlands do not merit the Attorney General's discretionary consideration, at the least, merely because their residence in the United states was unlawful ab initio. This is a doctrine for which I can find no basis in the immigration laws.
 
 
 
 [1]
 Section 245 of the Act, 8 U.S.C. § 1255(a), as amended, provides in pertinent part:
 "(a) The status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is approved."
 
 
 [2]
 Section 244(a) of the Act, 8 U.S.C. § 1254(a), provides in pertinent part:
 "(a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and
 "(1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence; . . .."
 
 
 [3]
 Section 241(a)(9) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(9) provides for the deportation of any alien admitted as a non-immigrant who fails to maintain that status. The application for a visitor's visa provides that gainful employment in the United States is a violation of visa conditions. See 8 C.F.R. § 214.1(a)
 
 
 [4]
 "Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor" are excludable pursuant to 8 U.S.C. § 1182(a)(14) unless they obtain labor certification from the Department of Labor. See Londono v. Immigration and Naturalization Service, 433 F.2d 635 (2d Cir. 1970) (per curiam) (aliens admitted as visitors may not obtain employment)
 
 
 [5]
 Mr. Heitland paid $703.97 in cash toward the purchase price and financed the balance through an auto loan
 
 
 [6]
 Section 212(a) of the Act, 8 U.S.C. § 1182(a) provides in pertinent part:
 "Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission in the United States; . . . .
 "(14) Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skill or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed."
 The purpose of this statute is to assure that immigrant aliens seeking to enter with a view to obtaining jobs will not displace American workers. Congress has sought to achieve this objective by denying entry unless the Secretary of Labor certifies that the labor force in which the alien proposes to work is inadequate and that employment of aliens will not adversely affect wages and working conditions.
 
 
 [7]
 8 C.F.R. § 212.8(b)(4), as it existed at the time when the 1971 application by the Heitlands for adjustment of status was filed, provided in pertinent part:
 "(b) Aliens not required to obtain labor certifications. The following persons are not considered to be within the purview of section 212(a)(14) of the Act and do not require a labor certification: . . . (4) an alien who will engage in a commercial or agricultural enterprise in which he had invested or is actively in the process of investing a substantial amount of capital."
 Effective January 12, 1973, the regulation was amended, see 38 Fed.Reg. 1380, to require that the alien invest capital totalling at least $10,000 in the commercial enterprise and establish that he has at least one year's experience or training qualifying him to engage in it. Effective October 7, 1976, the regulation was further amended to require an investment of at least $40,000 in an enterprise in which "he will be a principal manager, and that the enterprise will employ persons in the United States who are United States citizens or aliens lawfully admitted for permanent residence, exclusive of the alien, his spouse and children."
 
 
 [8]
 The record does not reveal whether Mr. Heitland, after acquiring the second van, continued to use the first in his business
 
 
 [9]
 Although the Heitlands in 1970 had approximately $6,000 in a savings bank account and Florida real estate valued at $11,000, there is no showing that these resources were invested in the operation of any commercial enterprise
 
 
 [10]
 Section 101(a)(13) of the Act, 8 U.S.C. § 1101, defines "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary."
 
 
 [11]
 Although Mr. Heitland testified that he went to Germany because his mother had recently died and his sister was ill, the record is bare of any further details as to the surrounding circumstances, including the reason why it was necessary for him and his wife to stay in Germany from December 22, 1970, to February 4, 1971, a period of 44 days
 
 
 [12]
 In his dissent Chief Judge Kaufman disputes the persuasive record evidence that the Heitlands, upon returning to the United States from Germany on February 4, 1971, implicitly lied to the INS about their intention to remain permanently in the United States and points to self-serving testimony given in 1975 by Mr. Heitland after he had filed his § 244(a) application for suspension of deportation, to the effect that he told the INS of his true intentions when he re-entered from Germany. Of course the Heitlands' credibility was a matter to be determined exclusively by the Immigration Judge, see Woodby v. INS, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); Masamichi Ikeda v. Burnett, 68 F.2d 276 (9th Cir. 1933); Wong Gim Ngoon v. Proctor, 93 F.2d 704 (9th Cir. 1937), who in this case obviously preferred to believe that Mr. Heitland was "admitted N/C" in order "to pass thru the U.S. to go to Canada, because you had no other kind of permit" and not to reside here, and that Mrs. Heitland claimed only the right to visit the United States for six months
 Indeed there is convincing record support for the inference that the Heitlands implicitly misrepresented their intentions to the INS. On April 23, 1971, only a couple of months after his return from the six-week stay in Germany, Mr. Heitland swore in an affidavit in his own handwriting filed with the INS that he had been admitted on February 4, 1971 as a "visitor." At an INS hearing on May 12, 1971, Mr. Heitland conceded that he was "illegally here as charged in the order to show cause," which had been issued by the INS on April 23, 1971, seeking his deportation. He admitted that when he entered the United States on February 4, 1971, it had been his "intention to remain indefinitely in the United States" even though he had not been "in possession of a valid immigrant visa or other entry document for permanent residence." Similar admissions were made by Mrs. Heitland. On March 1, 1972, Mr. Heitland again swore in an application Form I-485 for adjustment of status pursuant to § 245 that he had entered the United States on February 4, 1971 as a "visitor." Again similar sworn statements were repeatedly made by his wife.
 All of these damaging statements were made immediately after the events in question, at a time when they had less of a motive to falsify, since they were relying on their § 245 application. It was only in 1975, after adjustment of status had been denied and the Heitlands were now relegated to an application for suspension of deportation, for which seven years of continuous presence must be shown, that Heitland offered the testimony quoted by the dissent. Indeed, even then Mr. Heitland's 1975 testimony as to the events of February 4, 1971, is ambiguous. For instance, he testified that the INS inspector "mentioned something about no residence or something like this, and he put the white paper in there (Heitland's passport)," telling Heitland that he "couldn't go wherever I feel like", (emphasis added), but that he had "a permanent residence" because "the inspector in 1968 told me I would get my alien card in three to four weeks." Yet during the seven years from 1968 to 1975 no such card was ever issued. Shortly after his 1971 entry Heitland appeared at the INS in response to an Order to Show Cause issued on April 23, 1971, for his deportation.
 
 
 [1]
 The Heitlands offered numerous testimonials to their standing in their community and involvement in civic affairs. The letter submitted by Sister Lorna Colin, Educational Director of the John Oravecz Child Center, is typical:
 I have known Heinz and Laura Heitland for the past two years. Their daughter, Martina, is enrolled in our Day Care Program and they have been actively engaged in all activities that call for parent involvement.
 Heinz was elected to our Policy Advisory Committee by the total parent body and has proved to be a strong advocate for quality program that emphasizes sound child development concepts. Both he and his wife are concerned about community projects and volunteer their assistance whenever participation is requested.
 Through close association with the Heitlands during these two years, I would describe both Heinz and Laura as people of strong moral character; interested, enthusiastic, concerned. It has been a privilege to know them and I hope that privilege will be extended for many years to come.
 
 
 [2]
 In Itzcovitz an Argentine national who exercised his treaty right of exemption from American military service sought a declaratory judgment that he would not be excludable on his return after a three-week trip to Israel. The purpose of Itzcovitz's proposed trip was to attend a special training course required by his employer, El Al Airlines. We held that Itzcovitz's absence would not be meaningfully interruptive of his residence in the United States, and consequently his return would not be a "reentry" subjecting him to exclusion. It is important that Itzcovitz obviously foresaw potential immigration problems associated with his trip; that is why he sought a declaratory judgment. It is accordingly somewhat late in the day for us to restrict the application of Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963) to those cases in which the alien's absence is too trivial to alert him to the possible repercussions
 
 
 [3]
 According to the majority opinion, Mr. Heitland swore that he entered the United States in transit to Canada. With due respect, they are in error. Heitland testified on February 21, 1975, as follows:
 Q. Incidentally, let me ask you something, Mr. Heitland, when you came off the plane, you came off with your wife and child?
 A. That's correct.
 Q. You were examined standing together?
 A. That's right.
 Q. Well what did you tell the inspector you were coming to the United States for? Did he ask you how long you were coming here? How long you expected to stay here?
 A. Yes.
 Q. What did you tell him?
 A. I said I live here in United States, and I show him the passport of my daughter.
 Q. You told him you lived in the United States?
 A. Yes.
 Q. And he took your word and let you in?
 A. That's right. I think he wrote something in there about my residence or something like this and he put the white paper in there. I think he mentioned something about no residence or something like this, and he put the white piece of paper in there.
 Q. What did he question you about?
 A. That I couldn't go whereever (sic) I feel like.
 Q. That's right, you weren't a resident, so how could he admit you as a resident? That's what we want to know.
 A. I don't know. I don't know.
 Q. Did you tell him you were going back to Canada in a few days?
 A. No.
 On April 28, 1975, Immigration Judge Maltin read into the record that Mr. Heitland's Canadian passport showed his readmission "N/C", which Judge Maltin interpreted to mean that Mr. Heitland was admitted "as a nonimmigrant transit to the United States." The Immigration Judge then questioned Mr. Heitland as follows:
 Q. But do you understand that all you did was, well all he could do, was to admit you to pass through the U.S. to Canada, because you had no other kind of permit? Did you understand that at the time?
 A. At that time, I had an alien card, well not an alien card but a permanent residence because it was more or less issued. Well I told him that the inspector in 1968 told me I would get my alien card in three to four weeks.
 Q. And he admitted you and said to go down to the New York office and straighten that out?
 A. Right. . . .
 Q. I just wanted to know just how much the inspector explained to you. Did he explain to you that without the proper papers in your hand, he couldn't admit you for permanent residence. And did he tell you how he was admitting you?
 A. No.
 Judge Mansfield in footnote 12 of his opinion seems to labor under the erroneous belief that Judge Maltin found Mr. Heitland's testimony incredible. But, significantly, Judge Maltin not only did not rely on a theory of "implicit fraud" in denying consideration of the Heitlands' application for suspension of deportation but it seems, that this doctrine never crossed his mind. He believed, as the majority does not, that a six-week trip to Germany was in itself "meaningfully interruptive" of the Heitlands' presence here. Moreover, Judge Maltin never indicated any doubts regarding Mr. Heitland's credibility at any point in the transcript.
 Of course, Mr. Heitland has always conceded his illegal presence in the United States. It is the majority's reliance on this fact rather than any actual misrepresentation that I find so disturbing. In effect, the majority appears to discriminate between aliens illegally in this country and lawful residents in conferring the benefits of the liberal Fleuti rule. I believe this unwarranted discrimination is unauthorized by statute.
 
 
 [4]
 We recently indicated in another context the advisability of a flexible approach to the residence requirements of the immigration laws. See Tim Lok v. Immigration and Naturalization Service, 548 F.2d 37 (January 4, 1977)