Sombat KAMHEANGPATIYOOTH, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 77–3767.

United States Court of Appeals, Ninth Circuit.

May 30, 1979.

---

John A. Joannes, Los Angeles, Cal., for petitioner.

Brian H. Simpson, I & NS, San Francisco, Cal., for respondent.

Before BROWNING and ANDERSON, Circuit Judges, and WATERS,* District Judge.

BROWNING, Circuit Judge:

Petitioner is a native and citizen of Thailand who entered this country in 1964. He was authorized to remain until January 23, 1976. When he did not depart, the Immigration and Naturalization Service initiated deportation proceedings. Petitioner admitted deportability but applied for suspension of deportation under section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1).[1] The Immigration judge found petitioner ineligible for the relief sought because he had left the United States for a month in 1970, five years and 10 months before his application, and therefore had not been continuously present in the United States for the required seven-year period. The Board of Immigration Appeals affirmed. This petition followed. We conclude that the Immigration judge and the Board based their determinations upon an erroneous legal standard. We therefore vacate the Board's order and remand for further proceedings.

The facts are these. Petitioner was admitted to the United States as a student in January 1964 at the age of 20. By the winter of 1970 he had completed half of a four-year course of architectural studies at California Polytechnic Institute. On the advice of his brothers and sisters he decided to return to Thailand during the Christmas semester "break" to visit his mother, who was gravely ill.[2] He left the United States for Thailand on December 10, 1970, visited his mother, and returned on January 10, 1971, in time to resume second-semester classes. Before leaving on his trip petitioner obtained from California Polytechnic an Immigration Form I–20A, attesting to acceptance at an American educational institution. While in Bangkok he used this form to obtain a new student visa. In December 1973 petitioner graduated from California Polytechnic with a bachelor's degree in architecture. He has since been employed by an architectural firm in Fresno, California. His 30-day trip to visit his mother in 1970 was his only absence from the United States during the 12-year period from his initial entry in January 1964 until his application for suspension of deportation on November 8, 1976.

The Immigration judge held that this 30-day absence rendered petitioner ineligible for suspension of deportation. The Board of Immigration Appeals dismissed petitioner's appeal, stating simply, "[t]he decision of the immigration judge was correct," citing *Munoz-Casarez v. INS*, 511 F.2d 947 (9th Cir. 1975), and *Matter of Janati-Ataie*, 14 I & N 216, 221 (Atty.Gen.1972).

Section 244(a)(1) permits the Attorney General to consider the merits of an application for suspension of deportation only if the applicant "has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application." *See* note 1. The Immigration judge cor-

---

* Honorable Laughlin E. Waters, United States District Judge, Central District of California, sitting by designation.

1. Section 244(a)(1) provides:

     (a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and—
     (1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection, *has been*

*physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application*, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence . . . . (emphasis added)

2. Petitioner's mother died the following year.

rectly noted that the principles applied by the Supreme Court in *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), in deciding whether an entry was intentional within the meaning of section 101(a)(13) of the Act should also guide the determination of whether an intervening absence interrupts the continuity of physical presence for purposes of section 244(a)(1). We have so held. *Wadman v. INS,* 329 F.2d 812, 815 (9th Cir. 1964); *Git Foo Wong v. INS,* 358 F.2d 151, 153 (9th Cir. 1966). *See also Heitland v. INS,* 551 F.2d 495, 501 (2d Cir. 1977). Those principles mandate that neither section be read literally: "the term 'continuous' [in section 244(a)(1)] is no more subject to a hard and fast construction than is the term 'intended'" in section 101(a)(13). *Wadman v. INS, supra,* 329 F.2d at 816. Both sections therefore must be interpreted in light of the congressional purpose. Both sections are remedial, and hence are to be generously construed. More specifically, both sections are intended to relieve aliens of the harsh results, and of the unsuspected risks and unintended consequences, that would flow from a literal and rigid application of the provisions of the Act relating to expulsion and exclusion. *Rosenberg v. Fleuti, supra,* 374 U.S. at 457–58, 462, 83 S.Ct. 1804 (§ 101(a)(13)); *Heitland v. INS, supra,* 551 F.2d at 501, 502 (§ 244(a)(1)); 2 Gordon &

Rosenfield, Immigration Law and Procedure §§ 7.1a, 7.1b(3), 7.9a.[3]

From this perspective, the function of the section 244(a)(1) requirement that an applicant for suspension of deportation be physically present in this country for a continuous period of seven years becomes clear. It was Congress's judgment that presence of that length was likely to give rise to a sufficient commitment to this society through establishment of roots and development of plans and expectations for the future to justify an examination by the Attorney General of the circumstances of the particular case to determine whether deportation would be unduly harsh.[4] Continuity in the prescribed period of physical presence was required because continuity is important to the legitimacy of the inference that extended presence is likely to make deportation harsh. Presence that is only intermittent suggests the alien has not become so attached to this country that the authorities should consider suspending normal operation of the immigration laws on his behalf. As the Second Circuit has noted,

> deportation of an alien who ha[s] accumulated seven years of fragmented residence in the United States, interrupted by frequent or long absences abroad, would not be expected to work as much hardship upon him as might result if he

---

**3.** The remedial purpose of § 244 may be even clearer than that of § 101(a)(13): while there can be no doubt of the ameliorative aim of the § 244(a) suspension process, four dissenters in *Fleuti* rejected the majority's premise that § 101(a)(13) was meant to "temper [the] rigidity" of prior law regarding reentry (374 U.S. at 467, 83 S.Ct. 1804 (Clark, J., dissenting)).

A generous construction of the continuous presence requirement of § 244(a)(1) is also especially appropriate because it will not require relief to be granted where relief may be unwarranted. Indeed, a liberal construction will not require the granting of relief in any case; it will only allow the Attorney General to review the case on the merits and to decide whether in his discretion relief in fact would be warranted. *See Wadman v. INS,* 392 F.2d 812, 816–17 (9th Cir. 1964); 2 Gordon & Rosenfield, Immigration Law & Procedure § 7.9d at 7–94 (1978).

**4.** Congress first authorized discretionary suspension of deportation to ameliorate the harshness of mandatory deportation for technical

violations in 1940. Suspension was available to aliens of good moral character whose families would suffer "serious economic detriment" from deportation. 54 Stat. 670 (amending § 19(c) of the 1917 Act). In 1948 Congress added a new class of aliens eligible for suspension: those who could show "continuous residence" for seven years. 62 Stat. 1206. The Senate Committee explained:

> . . . . [T]here are a number of worthy cases in which persons, deportable on technical grounds, have lived in the United States for many years, but have no close family ties so as to enable them to become eligible for discretionary relief on the basis of serious economic detriment to [family members] . . . .. It is only just that . . . persons in this category . . . should have their cases considered for relief.

S.Rep.No.1204, 80th Cong., 2d Sess. (1948), *reprinted in* [1948] U.S.Code Cong. Admin.News, pp. 2234, 2236.

had resided in this country for an unbroken seven-year period, since the latter might reduce the likelihood of his being able to establish his home elsewhere. The statute surely was not designed to protect the wanderers or the rootless. Hence Congress used the word "continuous."

*Heitland v. INS, supra,* 551 F.2d at 501. Conversely, interruptions that are brief and infrequent do not diminish the probability that deportation would occasion undue hardship. An alien who leaves the country briefly and for innocent reasons during the requisite seven years may be in no different position, realistically viewed, than an alien who has remained within the borders for an identical period.

■ To effectuate the purposes underlying the continuous period requirement, and to realize Congress's desire (identified in *Fleuti*) to avoid exposing aliens to unexpected risks and unintended consequences, the Board must determine whether a particular absence during the seven-year period reduced the significance of the whole period as reflective of the hardship and unexpectedness of expulsion. An absence cannot be significant or meaningfully interruptive of the whole period if indications are that the hardship of deportation to the alien would be equally severe had the absence not occurred, and that no significant increase in the likelihood of deportation could reasonably have been expected to flow from the manner and circumstances surrounding the absence.

The Immigration judge and the Board did not evaluate the significance of petitioner's absence in this way. Instead, the Immigration judge purported to apply a *"Fleuti* test," which he described as "three pronged: the length of the visit, the purposes thereof, and whether the alien had to receive any travel documents to make the trip." The judge then noted that petitioner traveled "several thousand miles from the United States," was away a month, secured the I–20A form from school authorities before his departure, carried a recently extended Thai passport, and obtained a new student visa while abroad. "Applying the *Fleuti* yardstick," the judge concluded, petitioner's visit

> broke the continuity of his physical presence during the seven years for which he must establish continuous physical presence in the United States to qualify for suspension of deportation. In the face of the distance he traveled and his having left the United States armed with all the documents necessary to obtain a new student visa in Thailand, his one-month absence cannot be characterized as an "innocent, casual, and brief excursion" outside the United States, although he was going abroad only to visit his sick mother and intended to return to the United States. Accordingly, the respondent is ineligible for suspension of deportation. His application must be denied on that ground.

The Board viewed this approach as correct. We do not.

The Immigration judge fixed his attention directly on the duration of the absence, its purpose, and whether travel documents were obtained, and proceeded to treat these three factors as if they were in themselves determinative both of the meaning of "intended" departure in section 101(a)(13) and of the meaning of a "continuous period" of presence in section 244(a)(1). These three factors are among those identified by *Fleuti* (and adopted by *Wadman* for purposes of section 244) as relevant in determining whether an alien intended to depart in a manner "meaningfully interruptive" of permanent residence. But these factors are only evidentiary on the issue under section 244(a)(1) of whether an absence reduced the significance of the whole seven-year period as reflective of the hardship and unexpectedness of exposure to expulsion.[5] To treat

---

5. The alien's purpose may have a significance independent of its relevance in determining whether an absence has significantly affected the reasonableness of an inference that expulsion would be harsh and unexpected. In *Fleuti* the Court indicated that readmission following a journey abroad may constitute an "entry" within the meaning of § 101(a)(13) if the trip is

them as if they were in themselves the object of the inquiry may defeat the objectives of the statute.

■ This is apparent when the circumstances of this case are analyzed in terms of the purpose underlying the continuity requirement. When petitioner applied for suspension of deportation, he had been physically present in this country for over 12 years—six years and 11 months preceding the Thailand trip and five years and 10 months following it. His presence during all of that period was lawful, as a student or under other specific authorization to remain. In the course of these years he completed his education, obtained employment in his chosen profession, and pursued his career in this country, both before and after his visit to Thailand. This trip was his only absence from the country and it occurred almost exactly in the middle of the 12-year period. It was temporary by design, keyed to the break in classes between semesters. Petitioner left when classes ended, he returned when they resumed. His trip was as limited in duration and in distance as the exigencies that produced it—his mother's fatal illness at her home in Thailand—permitted it to be. Before petitioner departed he took the necessary steps to assure his return to complete his half-finished studies. His status in this country remained the same before and after his journey. Noth-

ing in the circumstances of petitioner's 30-day trip to Thailand detracts in any way from the inference, otherwise appropriate from the length and nature of the 12 years of his presence, that expulsion would be unexpected and would entail great hardship. In terms of the purposes served by the statutory requirement of a continuous seven-year waiting period, this interruption was clearly without significance.

■ The particular facts focused upon by the Immigration judge—the time petitioner was away, the distance he traveled, and the three documents petitioner obtained before or during the trip—should not, alone or in the aggregate, bar the Attorney General from considering the merits of petitioner's application for suspension of deportation. An absence of six or even 16 months does not interrupt the requisite continuity of physical presence as a matter of law. *See Toon-Ming Wong v. INS*, 363 F.2d 234, 236 (9th Cir. 1966), *citing McLeod v. Peterson*, 283 F.2d 180 (3d Cir. 1960).[6] Nor does travel to any specific point, no matter how distant break continuity conclusively. That petitioner required 30 days to accomplish his between-semesters visit to his dying mother on the other side of the world detracts little if at all from the attachment to this country demonstrated by petitioner's 12 years of residence.

undertaken "to accomplish some object which is itself contrary to some policy reflected in our immigration laws." 374 U.S. at 462, 83 S.Ct. at 1812. *See Palatian v. INS*, 502 F.2d 1091, 1093 (9th Cir. 1974); *Laredo-Miranda v. INS*, 555 F.2d 1242, 1245–56 (5th Cir. 1977). The same approach has been taken in cases under § 244(a). *Barragan-Sanchez v. Rosenberg*, 471 F.2d 758, 760 (9th Cir. 1972); *Heitland v. INS*, 551 F.2d 495, 501 (2d Cir. 1977). There is no suggestion that petitioner's purpose in visiting Thailand was tainted by any such object.

**6.** If Congress intended an outer limit on the length of non-interruptive absence, the circumstances leading to the 1952 amendment of the Act indicate that limit was not near the 30-day range. Prior to the 1952 revision, suspension of deportation was available to aliens who had "resided" continuously in the United States for the required seven years. The 1952 amendment substituted the present requirement of "physical presence" for that of residence. The

reason for this change is indicated in the report of a 1950 study, conducted by a special subcommittee of the Senate Judiciary Committee, out of which the 1952 Act grew. The subcommittee reported that INS field officers had complained regarding "the administrative interpretation of the 7-year residence provisions of the law. These provisions have been held applicable to an alien who has a total of 7 years' residence in the United States, although the alien has been out of the United States for as long as 2 years during the last 7 years . . ." S.Rep.No.1515, 81st Cong., 2d Sess. 602 (1950). Replacing the requirement of continuity of residence by the requirement of continuity of physical presence was apparently intended to respond to the field officer's complaints. This suggests that two-year absences might bar relief, if indeed it would be consistent with Congress's overall purposes to read any specific period, standing alone, as conclusively barring relief.

Similarly, the fact that petitioner renewed his Thai passport and secured a student visa undercuts rather than supports the Immigration judge's conclusion that petitioner's absence interrupted the continuity of his presence.

In some circumstances, obtaining travel documents may "cause the alien to consider more fully the implications involved in his leaving the country," *Rosenberg v. Fleuti, supra,* 374 U.S. at 462, 83 S.Ct. at 1812, and for this or other reasons may indicate that the alien's presence does not support an inference that expulsion would involve severe hardship, or may indicate that the alien was or should have been aware that his absence might adversely affect his opportunity to remain. *See Heitland v. INS, supra,* 551 F.2d at 502–03. On the other hand, the arrangements made by an alien prior to departure, including documentation obtained, may confirm the essential continuity of his presence in this country and the lack of any reasonable basis for anticipating that the planned absence might imperil his status.

In *Itzcovitz v. Selective Service,* 447 F.2d 888 (2d Cir. 1971), for example, an alien sought and obtained a declaratory judgment that his return after a trip from New York to Israel to complete a three-week training course at the behest of his employer (El Al Airlines) would not constitute an "entry" within the meaning of section 101(a)(13) because the trip could not be meaningfully interruptive of his permanent residence. In support of this argument the court said (447 F.2d at 894):

> But appellant is not in the posture of having taken the trip in disregard of the immigration consequences; rather he has here sought relief in advance. The purpose of his trip is entirely *bona fide,* honorable, and lawful. He has every in-

tention of retaining permanently his residence in the United States. And, indeed, the sole purpose of the three week trip is to qualify him for more useful employment service as he continues his permanent residence.

By contrast, in *Mamanee v. INS,* 566 F.2d 1103, 1105 (9th Cir. 1977), petitioner arranged for her family to join her in leaving the United States "for an indefinite time—at least until the petitioner's husband recovered from his [automobile accident] injury." These arrangements undermined petitioner's claimed continuity of presence.

In this case, petitioner, unlike *Itzcovitz,* did not seek a judicial determination of the limited impact of his trip before he took it. However, petitioner's conduct before his departure demonstrated with equal clarity that he was determined that his trip should not affect his status in this country. Petitioner testified that he obtained the certificate of continuing attendance at California Polytechnic (Form I–20A) because he understood he would be required to present this document on his return; he submitted the form to the American Embassy at Bangkok and obtained a new student visa because he knew his student visa had expired and a new one was required to permit him to return and continue his studies. Thus the steps petitioner took to obtain travel documents and the nature of the documents he obtained strongly support characterization of his absence as a brief interlude in an otherwise lengthy and continuous period of presence that cannot reasonably be treated either as significantly reducing the likelihood that petitioner had established roots making expulsion from this country unduly harsh, or as an event that petitioner should have known significantly enhanced the risk of expulsion.[7]

■ Petitioner forcefully argues that the only conclusion consistent with the statuto-

---

**7.** The principal case on which the Immigration judge and the Board relied, *Munoz-Casarez v. INS,* 511 F.2d 947 (9th Cir. 1975), is distinguishable. It is not evident if the alien procured travel documents in that case or, if so, what those documents suggested about the circumstances of his month-long departure. There was thus no affirmative demonstration that the petitioner in that case could not have expected

his trip to jeopardize the continuity of the period of his physical presence in the United States.

To the extent that the Attorney General's opinion overruling the Board in *Matter of Janati-Ataie,* 14 I & N 216, 221, 224 (Atty.Gen.1972), finds inadequate pre-absence affirmative action by the alien, we would read the facts of that case to warrant the opposite result.

ry purpose that can be reached on the undisputed facts of this case is that petitioner's absence did not break the continuity of his 12 years of physical presence in this country immediately preceding his application for suspension of deportation. Since we have determined that the Immigration judge and the Board based their contrary determinations upon an erroneous legal standard, the appropriate procedure is to remand to the agency for a new determination based upon the correct standard. *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Arnold v. Morton*, 529 F.2d 1101, 1105 (9th Cir. 1976). Accordingly, we remand for reconsideration of this issue, as well as for a determination of the issues of good moral character and hardship, and, should these statutory preconditions for consideration of the petition on the merits be satisfied, for the exercise of the Attorney General's discretion.

Vacated and remanded for further proceedings.

*Munoz-Casarez* and *Janati-Ataie* might also be distinguished on the ground that the aliens in both were attempting to avoid deportation under provisions that would have rendered them deportable only if their recent departures could be deemed "entries" under § 101(a)(13). Petitioner, by contrast, is attempting only to surmount an initial barrier to access to the Attorney General's discretion. The special ameliorative aims of the suspension process, and the fact that a decision in favor of the suspension applicant will not decide the ultimate question of whether relief should be granted, may support a more liberal reading of the continuous-presence requirement of § 244 than of the entry provision in § 101. *See* note 3.