**Nina Adelina FIDALGO/VELEZ,
Petitioner,**

v.

**IMMIGRATION AND NATURALIZA-
TION SERVICE, et al.,
Respondents.**

**No. 82–5088
Non-Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 11, 1983.

Stephen J. Polatnick, Miami, Fla., for petitioner.

Wade E. Strickland, Criminal Investigator, U.S.I.N.S., Dept. of Justice, Atlanta, Ga., Lauri Steven Filppu, Daniel E. Fromstein, Washington, D.C., for respondents.

Before TJOFLAT, JOHNSON and HATCHETT, Circuit Judges.

PER CURIAM:

Nina Adelina Fidalgo-Velez, petitioner in this case, appeals the order of the Board of Immigration Appeals ["BIA" or "the Board"] which found her deportable because she lacked a valid immigrant visa at the time of her entry. Finding all of respondent's arguments to be without merit, we affirm the decision of the Board.

Petitioner, a native and citizen of Colombia, entered the United States as a non-immigrant in 1968. She married Luciano C. Fidalgo, a United States citizen, on October 24, 1973. Mr. Fidalgo filed a petition on March 15, 1974, to classify petitioner as an immediate relative under Section 201(b) of the Immigration and Nationality Act ["the Act"], 8 U.S.C.A. § 1151(b). The immediate relative visa petition was approved on April 19, 1974, and submitted to the United States Consulate in Toronto, Canada, on May 7, 1974, for processing. On October 6, 1974, Mr. Fidalgo died.

On January 20, 1975, petitioner went to Toronto for a scheduled interview. During the interview she did not inform the consular officer that her citizen husband was deceased. The immigrant visa was granted and petitioner returned to the United States the same day. On January 29, 1975, an Immigration and Naturalization Service

["INS"] investigator took a statement from petitioner about the death of her husband.

On November 21, 1978, the INS issued an order to show cause charging that petitioner was deportable under Section 241(a)(1) of the Act, 8 U.S.C.A. § 1251(a)(1),[1] because she had entered the United States without a valid entry document. After a deportation hearing was held, petitioner was found deportable as charged. At the hearing, petitioner applied for discretionary suspension of deportation under Section 244(a)(1) of the Act, 8 U.S.C.A. § 1254(a)(1) ["Section 244(a)(1)"],[2] based on her continuous physical presence in the United States since 1968. Suspension of deportation was denied because the immigration judge found that the one day trip to Canada in 1975 broke the continuity of petitioner's physical presence in the United States.

Petitioner appealed the decision to the BIA. In an opinion dated September 29, 1981, the Board denied suspension relief, finding that petitioner went to Canada in 1975 to unlawfully obtain an immediate relative visa from the United States Consulate in Toronto and that she had failed even to allege that she would suffer the requisite extreme hardship.[3]

In order to qualify for suspension of deportation under Section 244(a)(1) of the Act, an alien must show that he has been physically present in the United States for at least seven years, that he has been a person of good moral character, and that his deportation would result in extreme hardship to himself or to his spouse, parent, or child who is a citizen or lawful permanent resident of the United States. Because we conclude that petitioner's trip to Canada interrupted the requisite period of physical presence, we do not reach the issue of whether she has demonstrated hardship.[4]

Neither the Fifth nor the Eleventh Circuit has addressed the continuous physical presence requirement of Section 244(a)(1).[5] The starting point for an analysis of whether petitioner's departure was "meaningfully

---

1. Section 241(a)(1) of the Act, 8 U.S.C.A. § 1251(a)(1), provides:
   Sec. 241. Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—
   (1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry;
   . . .

2. Section 244(a)(1) of the Act, 8 U.S.C.A. § 1254(a)(1), provides:
   (a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and—
   (1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence; . . .

3. On January 8, 1982, petitioner's new counsel filed a motion to reconsider and reopen for hardship, submitting affidavits of hardship for review since the record below failed to reflect such an allegation. The Board denied petitioner's motion on May 28, 1982. Petitioner has never filed a petition for review to challenge that decision.

4. It is doubtful that the hardship issue is properly before this Court since petitioner did not raise it until after the September 29, 1981, decision of the BIA and since she has not appealed the May 28, 1982, decision. See note 3.

5. The Supreme Court has also not addressed this issue, although certiorari was recently granted in *Phinpathya v. Immigration and Naturalization Service*, 673 F.2d 1013 (9th Cir. 1981), *cert. granted,* —— U.S. ——, 103 S.Ct. 291, 74 L.Ed.2d 275 (1982). The question presented for review by the Court is: May an alien's absence from the United States be considered meaningfully interruptive of his continuous physical presence in this country, for purpose of determining eligibility of suspension of deportation under Section 244(a)(1) if the hardships associated with the alien's deportation would be as severe if the absence had not occurred? —— U.S. ——, 103 S.Ct. 291, 74 L.Ed.2d 275 (1982).

interruptive" of her continuous presence in the United States is the Supreme Court's decision in *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). *Fleuti* held that the word "intended" should not be applied inflexibly in the exception to the entry doctrine for unintended departures by resident aliens under 8 U.S.C.A. § 1101(a)(13). The Court identified three factors [6] that should be considered in determining whether a departure was intended. The alien in *Fleuti* had gone to Mexico for a few hours; the Court remanded so that its three factor test could be used to determine whether his "innocent, casual, and brief excursion" was "intended" as a departure and thus "meaningfully interruptive." 374 U.S. at 462, 83 S.Ct. at 1812.

In *Wadman v. Immigration and Naturalization Service,* 329 F.2d 812 (9th Cir.1964), the Ninth Circuit adopted the three factor test of *Fleuti* for the continuous physical presence requirement of Section 244(a)(1). The petitioner in *Wadman* had spent seven and one half years in the United States, with the exception of a five day vacation trip to Mexico. The court remanded the case for resolution in light of *Fleuti,* declaring, "In our judgment the term 'continuous' is no more subject to a hard and fast construction than is the term 'intended.'" 329 F.2d at 816.

The Ninth Circuit expanded its liberal reading of Section 244(a)(1) in subsequent cases. In *Kamheangpatiyooth v. Immigration and Naturalization Service,* 597 F.2d 1253 (9th Cir.1979), the court clarified its use of the *Fleuti* factors, stating: "[T]hese factors are only evidentiary on the issue under section 244(a)(1) of whether an absence reduced the significance of the whole seven-year period as reflective of the hardship and unexpectedness of exposure to expulsion." 597 F.2d at 1257. Since the *Fleuti* factors had been relegated to "only evidentiary" matters, the *Kamheangpatiyooth* court promulgated a new standard to assess whether an alien's departure was "mean-

ingfully interruptive" of permanent residence. This new test was premised on the remedial nature of Section 244(a)(1) and an analysis of the rationale for the continuous presence requirement. *Kamheangpatiyooth* asserted that the continuous presence requirement embodied Congress' judgment that:

> presence of that length [seven years] was likely to give rise to a sufficient commitment to this society through establishment of roots and development of plans and expectations for the future to justify an examination by the Attorney General of the circumstances of the particular case to determine whether deportation would be unduly harsh. Continuity . . . was required because continuity is important to the legitimacy of the inference that extended presence is likely to make deportation harsh.

597 F.2d at 1256 (footnote omitted). Thus, "[t]o effectuate the purposes underlying the continuous period requirement," the proper inquiry is "whether a particular absence during the seven-year period reduced the significance of the whole period as reflective of the hardship and unexpectedness of expulsion." 597 F.2d at 1257. In *Kamheangpatiyooth* the court remanded so that the issue of whether the alien's 30 day trip to visit his ailing mother disrupted his 12 year period of physical presence could be determined under that standard rather than under the three *Fleuti* factors.

The most recent application of this broad test was in *Phinpathya v. Immigration and Naturalization Service,* 673 F.2d 1013 (9th Cir.1981), *cert. granted,* —— U.S. ——, 103 S.Ct. 291, 74 L.Ed.2d 275 (1982). Mr. and Mrs. Phinpathya, petitioners, had entered the United States as nonimmigrant students in 1969, authorized to remain here until July 1971. They remained beyond that date without permission. When deportation proceedings were brought against the Phinpathyas in 1977, they applied for suspension of deportation under Section 244(a)(1). Mr. Phinpathya's application was

---

**6.** The three factors that should be considered in determining whether a departure was intended are the duration of the absence, the purpose of the trip, and whether the alien had to obtain travel documents in order to make the trip. 374 U.S. at 462, 83 S.Ct. at 1812.

granted but Mrs. Phinpathya's was denied because she had visited her sick mother in Thailand for three months, breaking the seven years continuous physical presence requirement. The Ninth Circuit held that the BIA had erred "[b]y relying exclusively on the fact that Mrs. Phinpathya increased her risk of deportation by her absence." 673 F.2d at 1018. It emphasized that under *Kamheangpatiyooth* that fact is "only evidentiary." Instead, the appropriate inquiry is to "view the circumstances in their totality and in light of the underlying Congressional purpose." *Id.*

The broad and liberal interpretation of "meaningful interruption" developed by the Ninth Circuit in *Kamheangpatiyooth* and *Phinpathya* contravenes the plain language and the legislative history of Section 244(a)(1). *See McColvin v. Immigration and Naturalization Service,* 648 F.2d 935 (4th Cir.1981) (Congress intended that continuous physical presence requirement be applied in a rigorous manner). On its face, the statute does not provide an exception to the requirement of continuous physical presence. That this omission is deliberate is demonstrated by the legislative history of Section 244(a)(1). The predecessor statute to Section 244(a)(1), Section 19(c) of the Immigration Act of 1917, 39 Stat. 874, required that an alien have "resided continuously" in the United States for seven or more years. When the Act was revised in 1952 Congress broadened the class of aliens who may apply for suspension of deportation but made the requirements more restrictive, by substituting continuous physical presence for continuous residence and requiring a showing of exceptional and extremely unusual hardship instead of serious economic detriment. The purpose of these amendments was to "attempt to discontinue lax practices and discourage abuses." H.R. Rep. No. 1365, 82d Cong., 2d Sess. 31, *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1682. Congress amended the latter requirement in 1962 to require only "ex-treme hardship," 76 Stat. 1247, but left the physical presence requirement unchanged. If Congress had intended to permit physical absences during the seven year period, it could have required that an alien have seven years' continuous residence rather than seven years' physical presence. Our conclusion that Congress intended the physical presence requirement to be applied strictly is supported by the BIA, which has "consistently held that even a brief absence from the United States destroys the continuous physical presence required for eligibility for suspension of deportation." *Matter of Graham,* 11 I. & N.Dec. 234, 235 (BIA 1965). *Contra Matter of Herrera,* I. & N.Int.Dec. # 2853 (BIA 1981) (applying *Kamheangpatiyooth* standard because case arose in Ninth Circuit).

*Kamheangpatiyooth's* broad formulation of the continuous presence requirement also exceeds the flexibility permitted by *Fleuti.* As the Fourth Circuit observed in *McColvin,* "[t]he criteria laid down in *Kamheangpatiyooth* clearly gave rise to a broader interpretation of 'continuous' than the *Fleuti* court gave to 'intended.'" 648 F.2d at 938. Applying the *Fleuti* criteria to this case, it is clear that petitioner's departure was "meaningfully interruptive." Although the first *Fleuti* factor weighs in her favor because her absence was brief, it is undercut by the second and third.[7] The second *Fleuti* factor, the purpose of the visit, is most relevant here. The immigration judge who observed petitioner in the hearing commented on her high level of intelligence and concluded:

I can hardly believe that the respondent who was quite aware that she no longer had a United States spouse when she left to obtain a visa in Canada, did not know that what she was doing was wrong. She did go nevertheless with the full intention of procuring the visa notwithstanding that she had no right to it.

---

7. The third factor is whether the alien had to procure travel documents to make the trip. Petitioner did not have to obtain documents before her trip, but she went in order to get a visa, indicating that she had reason to consider "fully the implications involved in ... leaving the country." *Fleuti,* 394 U.S. at 462, 83 S.Ct. at 1812.

R. 66. Any flexibility incorporated into Section 244(a)(1) to protect a resident alien from "unsuspected risks and unintended consequences" as a result of *Fleuti* and *Wadman* only extends to "wholly innocent action." *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812. *See McColvin, supra* (one day departure under grant of voluntary deportation in lieu of deportation "meaningfully interruptive" of continuous physical presence); *Heitland v. Immigration and Naturalization Service,* 551 F.2d 495 (2d Cir.), *cert. denied,* 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977) (six week visit to Germany "meaningfully interruptive" when petitioners had remained in United States far beyond expiration of six week visitor visa). As in *Heitland,* petitioner used "implicitly deceptive methods to secure re-entry in the United States," 551 F.2d at 503. The ameliorative goals of *Fleuti* do not extend to those who engage in actions that are contrary to the "policy reflected in our immigration laws." *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812.

Petitioner's alternative argument is that the INS is equitably estopped from deporting her because it delayed in processing her immediate relative petition. The INS urges that petitioner cannot depend on estoppel for relief because she has unclean hands. *See United States ex rel. Circella v. Sahli,* 216 F.2d 33, 40 (7th Cir.1954), *cert. denied,* 348 U.S. 964, 75 S.Ct. 525, 99 L.Ed. 752 (1955). In any event, the Board addressed this issue in its denial of petitioner's motion to reopen. It concluded: "The 10 month delay in processing the visa application was not unreasonably long because adequate investigation of the validity and bona fides of the marriage was warranted in this case." It also noted that petitioner's concealment of her husband's death was a direct cause of her visa revocation; if she had reported his death, the Attorney General could have waived revocation of the immediate relative visa petition pursuant to 8 C.F.R. 205.1(a)(3) (providing that relative petitions are automatically revoked upon death of petitioner "unless the Attorney General in his discretion determines that for humanitarian reasons revocation would be inappropriate"). Petitioner has not raised any argument that refutes these conclusions of the Board.

Because petitioner's trip to Canada was "meaningfully interruptive" of the seven year period required for suspension of deportation under Section 244(a)(1), we AFFIRM the order of the BIA.