95 F.3d 1158
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Salvador Ali MARADIAGA, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 95-70238.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 11, 1996.
Decided Aug. 20, 1996.
 
 1
 Petition to Review a Decision of the Immigration and Naturalization Service, INS No. Azh-ftb-nga.
 
 INS
 PETITION GRANTED IN PART, DENIED IN PART
 
 2
 Before: FERNANDEZ and TASHIMA, Circuit Judges, and MERHIGE, Senior District Judge.*
 
 
 3
 MEMORANDUM**
 
 
 4
 Salvador Ali Maradiaga ("Maradiaga"), a native and citizen of Nicaragua, departed his country and entered the United States without inspection in 1989, in violation of § 241 of the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1251(A)(2). We deny the petition as to the Board of Immigration Appeals' (the "Board") denial of Maradiaga's request for asylum and withholding of deportation, under sections 208 and 243(h) of the Act, 8 U.S.C. §§ 1158 and 1253(h), but grant the petition as to the Board's determination that he did not qualify for suspension of deportation under section 244 of the Act, 8 U.S.C. § 1254.
 
 I.
 
 5
 Maradiaga claims that while a student in Nicaragua, Sandinistas removed him and others, who refused to participate in pro-Sandinista rallies and political meetings, from school and forced them to perform unpaid labor. He admits, however, that he did not view this work as punitive, and was even allowed to enroll in a university during this time. Maradiaga only completed a few months of university study, however, because he refused to serve in the Sandinista military. Shortly thereafter, Maradiaga left Nicaragua, and after passing through Guatemala and Mexico, arrived in the United States for the first time in 1983.
 
 
 6
 After arriving in the United States, Maradiaga married a lawful permanent resident and has been continuously employed since that time. He alleges that his only departure from the United States was a four-month return to Nicaragua in 1989. He made this trip in an attempt to obtain an immigrant visa at the United States Embassy in Managua, Nicaragua.
 
 
 7
 Maradiaga left for Nicaragua on a Mexicana flight on April 18, 1989, and his return ticket to the United States was for May 6, 1989. While in Nicaragua, he made three or four trips to the U.S. Embassy in Managua and met with the American Counsul in late April, 1989. His application for a visa, however, was denied in late April, 1989, after testing positive for the HIV virus. A positive HIV test is a ground for exclusion under the Act. See section 212(a)(i)(A)(i) of the Act, 8 U.S.C. § 1182(a)(1)(A)(i). Rather than using his airplane ticket and facing a rejected re-entry into the U.S., Maradiaga cashed in his return ticket.
 
 
 8
 Maradiaga claims that sometime during May or June of this trip, he was arrested by Sandinista Ministry of Interior authorities suspicious of his visits to the U.S. Embassy. He was never charged or represented by counsel and was allegedly told that he was a "pro-Yankee" suspect. He was detained for about two weeks and mistreated by being pushed to the floor, threatened with unlimited imprisonment, and denied access to lavatory facilities. Maradiaga was questioned about his reasons for visiting the U.S. Embassy and accused of being a Contra sympathizer. He denied having any Contra contacts in the United States and was released after two weeks detention.
 
 
 9
 A month after his release, Maradiaga began to plan his return to the United States. He stayed in Nicaragua during this time while awaiting a visa to travel to Guatemala. Maradiaga claims that when leaving for Nicaragua in 1989, he received a passport through the Nicaraguan Embassy in Washington, but left the passport with his parents because "I was afraid I could lose it." With no return ticket and no passport, Maradiaga planned to enter illegally and then request political asylum. He eventually arrived in the U.S. four months after originally departing for Nicaragua, and admitted doing so illegally.
 
 
 10
 After returning to the United States, Maradiaga claims to have received two letters sent by his adoptive father, recounting several visits by Sandinista police looking for Maradiaga and questioning the father, and warning Maradiaga not to return to Nicaragua.[1] Also after returning to the United States, Maradiaga first learned that he was Jewish, when his adoptive parents told him that his natural mother had been Jewish.[2] Currently, he regularly attends synagogue services. He claims that if forced to return to Nicaragua, he would not be able to practice his religion because "there is no synagogue" and a majority of the Jewish people left at the time of the revolution. He said that the synagogue was partially destroyed. Although he claims that there is antisemitism in Nicaragua, he admits, "I think with [President] Chamorro there might be good relations." Maradiaga believes that the synagogue and property, previously confiscated by the government from Nicaraguan Jews, has not been returned.
 
 
 11
 Maradiaga currently has no family in the United States. His only family are his adoptive parents, who are in Nicaragua. He and his wife have been separated since his 1989 return from Nicaragua. She did not accompany him to Nicaragua because "she didn't want to go because we already had problems." Maradiaga belongs to no organizations other than his labor union. His only valuable property is $3,000 worth of jewelry, and his savings and checking bank accounts have been closed and cancelled. He speaks little English.
 
 
 12
 One week after his 1989 return from Nicaragua, and prior to being charged with deportability, Maradiaga applied for political asylum. That application was denied by the INS, and on October 10, 1989, Maradiaga was served with an Order to Show Cause why he should not be deported from the United States.
 
 
 13
 At various preliminary hearings before the Immigration Judge ("IJ"), Maradiaga renewed his political asylum and withholding of deportation claims, and also added a claim for religious persecution and an application for suspension of deportation. On May 8, 1991, the IJ conducted a hearing on the merits of Maradiaga's claims. The IJ denied the applications for asylum, withholding of deportation, and suspension of deportation, but granted Maradiaga's request for voluntary departure. Maradiaga appealed to the Board.
 
 
 14
 After reviewing the record de novo, on January 24, 1995, the Board affirmed the IJ's decision. First, as to the suspension of deportation claim, the Board found Maradiaga's trip to Nicaragua, which interrupted his continuous presence, was not "brief, casual, and innocent." Therefore, because he did not physically reside in the United States for seven continuous years, as required under the Act, he did not qualify for suspension of deportation.
 
 
 15
 In denying Maradiaga's request for asylum, the Board initially found that petitioner failed to establish "past persecution," noting that neither Sandinista pressure to perform volunteer labor, nor the 1989 arrest rose to a necessary level for finding past persecution based on political opinion.
 
 
 16
 The Board also determined that Maradiaga failed to demonstrate that the change of government in Nicaragua has not reduced or eliminated the authorities' interest in him. The record shows that Maradiaga had no connections to the Contras, and the orders of detention and letters from his father pre-date the Sandinistas' 1990 election loss. Therefore, the Board found no fear of future persecution on account of political opinion.
 
 
 17
 Finally, the Board found no fear of future persecution on account of religion. Maradiaga did not find out that he was Jewish until his return to the United States, and was never persecuted on account of his religion during his time in Nicaragua. Additionally, the Board noted that since 1990, the Nicaraguan government has offered to return the synagogue in Managua for religious celebration, and the Jewish community is attempting to resume services. The Board found no evidence that Jews in Nicaragua are systemically persecuted based on religion or ethnicity, or that Maradiaga would be personally persecuted. In light of the denial of Maradiaga's asylum claims, the Board also denied his claim for withholding of deportation.
 
 
 18
 Despite denying the claims for this requested relief, the Board nevertheless granted Maradiaga voluntary departure, effective within thirty days of the date of the order.
 
 II.
 A. ASYLUM
 
 19
 (i) Fear of Future Persecution Based on Religion
 
 
 20
 Section 208(a) of the Act, 8 U.S.C. § 1158(a), gives the Attorney General discretion to grant political asylum to any alien the Attorney General determines to be a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A). A refugee is defined as an alien unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish eligibility on the basis of a "well-founded fear of persecution," Maradiaga's fear of persecution must be both subjectively genuine and objectively reasonable. Ghaly v. INS, 58 F.3d 1425, 1428 (9th Cir.1995).
 
 
 21
 We review the Board's determination that Maradiaga failed to demonstrate a "well-founded fear of persecution," including its factual findings, for substantial evidence. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); 8 U.S.C. § 1105a(a)(4). Maradiaga must demonstrate that "the evidence [he] presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Elias-Zacarias, 502 U.S. at 483-84, 112 S.Ct. at 817. Maradiaga has failed to meet this burden.
 
 
 22
 Since the Sandinistas were defeated in the 1990 elections, the Chamorro government has offered to return the synagogue in Managua to the Jews, and the Jewish community in Nicaragua is currently attempting to resume services in the synagogue. Furthermore, Maradiaga has presented no evidence that Jews in Nicaragua are currently being systematically persecuted based on their religion. In fact, Maradiaga previously admitted that "I think with Chamorro there might be good relation." As the Board noted, while Maradiaga may face "personal discrimination or bigotry" in his country, "this discrimination does not rise to the level of persecution under the immigration laws." Finally, there is no evidence that the Nicaraguan government has ever persecuted Maradiaga in the past because of his religion, nor is there evidence that the Nicaraguan government is, or would be, interested in whether he is Jewish.
 
 
 23
 (ii) Persecution Based on Political Opinion
 
 
 24
 Maradiaga argues that his treatment at the hands of the Sandinistas while imprisoned in 1989 rose to the level of persecution and was in effect "torture." He claims that in "being denied access to lavatory facilities," he was forced to defecate in his own cell, and maintains that these facts compel a finding that the treatment he was subjected to constituted physical and mental torture amounting to severe persecution. Additionally, Maradiaga asserts that the persecution he suffered while imprisoned was because of his political opinions, essentially arguing that his mistreatment was based upon a belief by the Sandinistas that he was allied with the Contras or the United States. We reject Maradiaga's arguments.
 
 
 25
 Under the analysis of Matter of Chen, Int.Dec. 3104 (BIA 1989), a grant of asylum may be proper even if there is no reasonable likelihood of present persecution, as long as the past persecution was so severe that returning the applicant to his home country would be inhumane. Id. at 4-5. In Chen, the petitioner was tortured systematically for eight years during China's Cultural Revolution because of his religious beliefs. During the eight-year period, he was locked in a room for six months, continually beaten and starved, and denied medical care. Id. at 5-6.
 
 
 26
 The facts of this case do not rise anywhere near the level of torture found in Chen. While confining an individual to a cell with no lavatory facilities may be considered inhumane, Maradiaga was only confined for a two-week period, and was released as soon as officials were satisfied that he was not connected to the Contras. He may have been pushed to the ground, but there is no evidence that he was brutally beaten like the petitioner in Chen. Certainly, Maradiaga was not subjected to the systematic and continuous torture necessary to find the extreme past persecution which he is compelled to show.
 
 
 27
 Furthermore, we agree with the Board that the two-week detention was not ultimately on account of his political opinion. The record indicates that Maradiaga was confined because officials were suspicious of his trips to the United States Embassy in Managua. In INS v. Elias-Zacarias, 502 U.S. at 482-83 (1992), the Supreme Court explained that an alien must prove that the persecutor's motive is to harm the alien specifically because of his political opinion. The record in this case does not reflect that Maradiaga had a known political opinion at the time of his arrest. Additionally, the mistreatment appears to have been conducted in an effort to elicit information from Maradiaga about his connections to the Contras and the U.S. government. He was clearly not imprisoned simply because of his political beliefs. Finally, Violet Chamorro's 1990 victory over the Sandinistas has considerably changed the political climate in Nicaragua. Although Sandinistas may continue to have power within the government, Maradiaga has failed to present any evidence that he would be a target for persecution by the new government.
 
 
 28
 Maradiaga has failed to present "credible, direct, and specific" evidence of facts supporting a reasonable fear of persecution, Ghaly v. INS, 58 F.3d at 1428, and therefore, we uphold the Board's determination that Maradiaga failed to establish a well-founded fear of future persecution based on religion or political opinion and its denial of his claim of asylum.
 
 B. Mandatory Withholding of Deportation
 
 29
 Section 243(h) of the Act, 8 U.S.C. § 1253(h), requires the Attorney General, subject to certain exceptions not relevant here, to withhold deportation "if the Attorney General determines that such alien's life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion." An alien is statutorily eligible for such relief if he or she demonstrates a "clear probability of persecution." Ghaly, 58 F.3d at 1429. This standard is more stringent than the "well-founded fear" standard applicable to requests for asylum, and it can be met only by showing that it is more likely than not that the alien will be persecuted if deported. Id. "Therefore, failure to satisfy the lesser standard of proof required to establish eligibility for asylum necessarily results in a failure to demonstrate eligibility for withholding of deportation as well." The decision to deny withholding of deportation is reviewed for substantial evidence. Ghaly, 58 F.3d at 1429.
 
 
 30
 Having decided that Maradiaga failed to establish a well-founded fear of persecution, we also hold that he "cannot meet the higher burden of establishing a clear probability of persecution." Cuadras v. INS, 910 F.2d 567, 572 (9th Cir.1990). Therefore, we uphold the Board's denial of mandatory withholding of deportation.
 
 C. Suspension of Deportation
 
 31
 Section 244(a)(1) of the Act, 8 U.S.C. § 1254(a)(1), authorizes the Attorney General to suspend the deportation of an alien who (1) has been physically present in the United States for not less than seven years immediately preceding the date of application; (2) is a person of good moral character; and (3) is "a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence."
 
 
 32
 As to the first requirement, the Supreme Court had previously held that any absence from this country, "however, brief, casual, or innocent," during the seven-year period precludes relief under the statute. INS v. Phinpathya, 464 U.S. 183, 196 (1984). In response to this decision, however, Congress enacted section 244(b)(2) of the Act, 8 U.S.C. § 1254(b)(2), which states that an:
 
 
 33
 alien shall not be considered to have failed to maintain continuous physical presence in the United States ... if the absence from the United States was brief, casual, and innocent and did not meaningfully interrupt the continuous physical presence.
 
 
 34
 (emphasis added). The factual finding that Maradiaga's departure was not "casual" is reviewed for substantial evidence. Hernandez-Luis v. INS, 869 F.2d 469 (9th Cir.1989).
 
 
 35
 The Board found that Maradiaga's departure in 1989 was not "casual," and therefore, his physical presence was meaningfully interrupted. The Board focused on the long, deliberate process involved in leaving this country in an effort to obtain an immigrant visa. The Board stated that obtaining an immigrant visa is the result of an often "long and complex process," and Maradiaga was "aware that his actions had potential immigration implications." Therefore, it determined that his departure cannot be considered "casual" in nature.
 
 
 36
 While the Board noted that Maradiaga was aware that his ability to return to the United States after being denied a visa was not only possible through "uncertain and surreptitious means," it did not consider Maradiaga's "means of return from Nicaragua to be a negative discretionary factor in the instant case." The Board did not consider this factor in a negative light because of the "sympathetic nature" of Maradiaga's learning of his medical condition, and of the fact that he applied for asylum immediately upon returning to the United States, rather than waiting for deportation proceedings to begin against him.
 
 
 37
 We are bound to defer to the Board's determination of what factors may be considered in determining whether a departure was casual, unless the agency's interpretation is plainly contrary to the sense intended by the Congress. U.S. D.O.C. v. F.E.R.C., 36 F.3d 893, 896 (9th Cir.1994); Chemical Mfrs. Assn. v. NRDC, 470 U.S. 116, 125 (1985). In light of the Ninth Circuit's recent decision in Castrejon-Garcia v. INS, 60 F.3d 1359 (9th Cir.1995), however, we reverse the Board's determination that Maradiaga's trip to Nicaragua was not "casual."
 
 
 38
 In Castrejon, we overturned a Board determination that a petitioner who took an eight-day trip to Mexico in order to secure a visa from the American Consulate had failed to maintain a "continuous physical presence" in the United States. We explained that (1) when petitioner's absence was for no more than eight days, his absence is "brief;" (2) when the purpose of his absence is to obtain a visa, his absence is "innocent"; (3) when the purpose of his absence is to regularize his status in the U.S., he has not "meaningfully interrupted his physical presence;" and (4) when his absence is on a single occasion it is "casual." Id. at 1363. We noted that § 1254 must not be construed to "penalize an effort to become a lawful resident by a man who has been in this country continuously for twenty-five years, has a family, a business, and a moral character that has been determined to meet the statutory standard." Id. Finally, we explained that the "evident statutory purpose" of § 1254 is that an individual who lives continuously in the United States for seven years does not destroy his eligibility by "actions that do not affect his commitment to living in this country." Id. at 1362.
 
 
 39
 Similar to the petitioner in Castrejon, Maradiaga left the United States in an attempt to secure an immigrant visa. He did so in order to become a lawful resident of this country. He did not, however, ever take actions that called into question his commitment to living in this country. Rather, he made one isolated trip to Nicaragua in order to secure his ability to stay in the United States.
 
 
 40
 The very reasons on which the Board decided Maradiaga's departure was not "casual" were effectively rejected by this Court in Castrejon. In fact, in both Castrejon and the instant case, the Board used similar language in its opinions regarding the "deliberate" nature of a departure to obtain an immigrant visa. The Castrejon Court, however, held that an individual's trip outside this country for the purpose of obtaining an immigrant visa should not be held against him, and does not necessarily render the trip as being a "meaningful interruption" of his presence in the United States.
 
 
 41
 The INS attempts to distinguish Castrejon by arguing (1) that Maradiaga's stay was for four months, not eight days, and therefore was not "brief"; (2) that his purpose in applying for the visa was not "innocent" because he intended to obtain a visa based on a marriage to a lawful permanent resident, when in fact, he was having marital problems with his wife, and unlike Castrejon, Maradiaga stayed in Nicaragua after the Consulate denied his visa; and (3) Maradiaga willfully re-entered the United States after being informed that he was excludable based on his medical condition, unlike Castrejon, who returned prior to a decision being rendered in his case. We reject these arguments.
 
 
 42
 First, although Petitioner's stay in Nicaragua was for a considerably longer time than Castrejon, part of that time was spent in a Nicaraguan jail, while another part of the time was spent attempting to find a way to re-enter this country. While his stay was not as "brief" as that of Castrejon, Maradiaga should not be blamed for his extended stay. Clearly, he did not intend to stay for four months, as evidenced by his return airline ticket. He was forced to stay only after finding out he was HIV positive and could not legally re-enter this country. We agree with the Board's determination that Maradiaga's actions in re-entering this country illegally should not be held against him in light of his sympathetic medical condition and his immediate request for asylum upon entering the country. His trip began in an effort to obtain an immigrant visa, an action approved by Castrejon, and was prolonged by the two-week detention and Maradiaga's efforts to re-enter the country. Therefore, in light of these circumstances, we find his departure to be "brief."[3]
 
 
 43
 As discussed previously, Maradiaga entered this country illegally only after finding out he was HIV positive. He also re-entered and immediately sought asylum. Furthermore, although Maradiaga admitted having marital problems at that time, he was not in fact divorced, nor was there evidence that divorce was imminent. Therefore, we find his departure was "innocent."
 
 
 44
 Finally, based on the definition of "casual" put forth by Castrejon, that being "occasional," we find Maradiaga's single trip outside the United States to be "casual."
 
 
 45
 Accordingly, despite the deference afforded the Board's decision on this issue, and in light of Castrejon, we find that Maradiaga's trip was brief, casual, and innocent, and did not result in a meaningful departure from this country. Therefore, his departure in the United States has been "continuous."
 
 
 46
 Having decided that Maradiaga's departure was in fact "continuous," we must also decide whether Maradiaga is a person of "good moral character" and whether "extreme hardship" would result from his deportation. 8 U.S.C. § 1254(b)(2). In denying the claim for suspension of deportation, the IJ decided that Maradiaga was of "good moral character," but found that he would not suffer "extreme hardship" upon return to Nicaragua. The IJ based this determination on the fact that Maradiaga had not developed AIDS, was in good health, and had not substantially extended himself into the general society and culture of the United States. The Board, however, never ruled on these issues after making the dispositive determination that Maradiaga's departure was not "casual." The parties have also not briefed these issues on appeal.
 
 
 47
 In light of these facts, we overturn the Board's determination that Maradiaga was not eligible for suspension of deportation for failing to have a "continuous" presence in the United States, and REMAND the case to the Board for a determination of Maradiaga's moral character and the potential for "extreme hardship" if he were forced to return to Nicaragua.[4]
 
 III.
 
 48
 In conclusion, we DENY the petition as to the Board's denial of Maradiaga's request for asylum and withholding of deportation. As to the suspension of deportation claim, we GRANT the petition as to the finding that Maradiaga's 1989 departure was not "casual," and therefore broke the continuity of his presence in this country. We REMAND the case to the Board for a determination of Maradiaga's moral character and the potential, in light of his medical condition, for extreme hardship if forced to return to Nicaragua.
 
 
 
 *
 The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 **
 This disposition is not suitable for publication and may not be cited to or by the courts of this Circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The Board noted that these letters were not accompanied by envelopes or other indicia that they were sent from Nicaragua
 
 
 [2]
 This is why, Maradiaga explained, his first asylum application, states that he is Catholic (which is the religion his adoptive parents raised him). He does not consider himself to be a devout Catholic
 
 
 [3]
 See Kamheangpatiyooth v. INS, 597 F.2d 1253, 1258 (9th Cir.1979), where the Ninth Circuit stated that "an absence of six or even 16 months does not interrupt the requisite continuity of physical presence as a matter of law."
 
 
 [4]
 At the IJ hearing, Maradiaga testified that he would face hardship upon return to Nicaragua, because he would not be able to easily obtain the medication he currently receives for his HIV condition. Furthermore, his doctor stated that Maradiaga would develop AIDS upon returning to Nicaragua